UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HAKEEM ALLI-BALOGUN,                          **MEMORANDUM & ORDER**

                    Defendant,

        – against –                           92–CR–1108

UNITED STATES of AMERICA,

                    Plaintiff.


HAKEEM ALLI-BALOGUN,

                    Petitioner,               13-CV-07423

        – against –

UNITED STATES of AMERICA,

                    Respondent.


**Parties**                              **Appearances**

Hakeem Alli-Balogun                      John F. Kaley
                                         Doar Rieck & Mack
                                         217 Broadway, Suite 707
                                         New York, NY 10007
                                         (212) 619-3730
                                         jkaley@doarlaw.com

United States of America                 Margaret Elizabeth Lee
                                         U.S. Attorney's Office
                                         Eastern District of New York
                                         271 Cadman Plaza East
                                         Brooklyn, NY 11201
                                         (718) 254-6205
                                         margaret.lee@usdoj.gov

**J**ACK **B. W**EINSTEIN, **Senior United States District Judge:**

## Table of Contents

I.     Introduction ............................................................................................. 3
   A.  Motion for Reduction of Sentence, 18 U.S.C. § 3582(c)(2) ...................... 3
   B.  Motion to Vacate Conviction, 28 U.S.C. § 2255 .................................... 6
II.   Facts and Procedural History .................................................................. 6
   A.  Crime of Conviction ........................................................................... 6
   B.  Sentencing ........................................................................................ 8
     1.   Appeal ....................................................................................... 8
     2.   Collateral Attacks .................................................................... 9
   C.  Resentencing ................................................................................... 10
     1.   Appeal and *Crosby* Remand .................................................. 11
     2.   Reinstatement of Appeal ....................................................... 12
   D.  Instant Motions .............................................................................. 16
     1.   Motion for Reduction of Sentence, 18 U.S.C. § 3582(c)(2) ...... 16
     2.   Motion to Vacate Conviction, 28 U.S.C. § 2255 ..................... 18
III.  Motion for Reduction of Sentence, 18 U.S.C. § 3582(c)(2) ..................... 20
   A.  Underlying Statutes, Background Principles and Precedent ................ 20
     1.   Statutory Authority ................................................................ 20
     2.   Role of Sentencing Commission and Powers Delegated To It ... 23
     3.   Brief History of Section 1B1.10 of the Sentencing Guidelines .............. 29
       a.  Inception .......................................................................... 29
       b.  Substantive Amendments ................................................. 31
       c.  2014 Amendments ........................................................... 32
         i.   Reason for Amendment 788 .......................................... 33
         ii.  Public Hearing and Vote ............................................... 34
     4.   Binding Nature of Section 1B1.10(b) of the Sentencing Guidelines ....... 38
       a.  Supreme Court ................................................................. 38
       b.  Court of Appeals for the Second Circuit ............................ 41
     5.   Binding Nature of Section 1B1.10(e) of the Sentencing Guidelines ....... 42
       a.  Appellate Courts .............................................................. 42
       b.  District Courts ................................................................. 42
   B.  Law ................................................................................................ 45
     1.   Rule of Lenity ........................................................................ 45
       a.  Generally ......................................................................... 45
       b.  As Applied to the Sentencing Context .............................. 47
     2.   Due Process ........................................................................... 49
       a.  Generally ......................................................................... 49
       b.  As Implicated in Sentence Administration Decisions .......... 51
         i.   Supreme Court ............................................................. 51
         ii.  Court of Appeals for the Second Circuit ........................ 55
         iii. District Courts in the Second Circuit .............................. 57
         iv. 28 U.S.C. § 2241 .......................................................... 58

     3.    *Ex Post Facto* Clause ................................................................................. 59
         a.   Generally ............................................................................................. 59
         b.   As Implicated in Sentence Administration Decisions ............................. 60
     4.    Eighth Amendment .................................................................................. 66
   C.  Application of Law to Facts ............................................................................. 67
     1.    Rule of Lenity .......................................................................................... 68
     2.    Due Process .............................................................................................. 69
     3.    *Ex Post Facto* Clause .............................................................................. 72
     4.    Eighth Amendment .................................................................................. 73
IV.   Motion to Vacate Conviction, 28 U.S.C. § 2255 .......................................... 73
   A.  Law ................................................................................................................. 73
   B.  Application of Law to Facts ............................................................................. 76
V.    Conclusion ............................................................................................................ 77

## I.    Introduction

This memorandum covers two independent applications for Hakeem Alli-Balogun. The first, his motion for a reduction of sentence, is dealt with in *infra* Parts I.A, II & III. The second, challenging his conviction, is covered in *infra* Parts I.B, II & IV.

The case is a remarkable one. Though the drug case was nasty, the long-term imprisonment, by today's standards, was excessive. Defendant has served 273 months in prison while his wife and children established high status employment in banking and medicine. *See* Hr'g Tr., July 15, 2015. Throughout his incarceration, he has maintained close contact with his family. *Id.* This resentence provides an opportunity to rectify, in modest degree, an unnecessarily harsh sentence imposed in crueler times.

### A.  Motion for Reduction of Sentence, 18 U.S.C. § 3582(c)(2)

It is held that the trial court is not bound by the Sentencing Commission's "special instruction" appended to section 1B1.10 of the Sentencing Guidelines ("guidelines"). *See* United States Sentencing Guidelines ("U.S.S.G.") § 1B1.10(e). The "special instruction" dictates that, in retroactively applying amendment 782, which reduces offense levels in the drug quantity

tables of the guidelines by two, the earliest date a resentenced prisoner can be released from custody is November 1, 2015. *See infra* Part III.

The special instruction was effective on November 1, 2014. Neither the United States Supreme Court nor the Court of Appeals for the Second Circuit has decided whether this special instruction is binding. *See infra* Part III.A.5. Decisions by other courts of appeals and district courts enforce the November 1, 2015 release date as mandatory without questioning its validity. *Id.* Courts that have found the instruction binding have done so based on an analysis of the powers ascribed to the Sentencing Commission by statute and a questionable application of the Supreme Court's decision in *Dillon v. United States*, 560 U.S. 817 (2010). *Id. Dillon* is inapplicable. *See Dillon*, 560 U.S. 817. It dealt with section *1B1.10(b)* ("Determination of Reduction in Term of Imprisonment") of the guidelines. *Id.* at 819. This memorandum and order deals with section *1B1.10(e)* ("Special Instruction"). *See* U.S.S.G. § 1B1.10(e).

Hakeem Alli-Balogun, a Nigerian citizen legally resident in the United States, is currently serving a 327-month sentence based in part on the sentencing court's conclusion in 2002 that movant was a leader in "one of the worst" international drug smuggling conspiracies. *See* Resentencing Hr'g Tr. 17, No. 92-CR-1108, Mar. 11, 2002 ("Resentencing Hr'g"). Alli-Balogun has been in custody for almost twenty-three years, 273 months in total. His present release date is July 5, 2016.

Defendant moves:

*First*, to resentence him to "time-served" in accordance with section 3582(c)(2) of title 18 of the United States Code and amendments 782 and 788 to the guidelines. *See* 18 U.S.C. § 3582(c)(2); U.S.S.G. supplement to app. C. amends. 782 and 788. The amendments, colloquially referred to as the "drugs minus two" amendments, reduce and make retroactive a

two-level reduction of the offense levels present in the drug quantity tables of section 2D1.1(c) of the guidelines. *See* U.S.S.G. supplement to app. C. amends. 782 and 788. Claimed is that Alli-Balogun has served more than the maximum sentence applicable under the reduced guidelines range, which falls between 210 and 262 months.

*Second*, to ignore the delayed release date of November 1, 2015 promulgated by the Sentencing Commission. *See* U.S.S.G. § 1B1.10(e).

Granted are movant's first and second motions. His current sentence is an unjust artifact of a crueler period.

Although movant might benefit from placement in a community correctional facility, because he is going to be deported—consistent with this court's sentencing policy with respect to non-citizens—he is being sentenced to time-served. *See United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *1 (E.D.N.Y. Sept. 24, 2014) (extensive discussion regarding court's policy of sentencing non-citizens to time-served). Alli-Balogun is ordered to be released forthwith. *See* Hr'g Tr., July 15, 2015. A three-year term of supervised release is imposed. *Id.* This decision is stayed for ten days to permit Immigration and Customs Enforcement to take custody of defendant. *Id.* At the July 15, 2015 resentencing hearing, the court was informed that a detainer had already been lodged by immigration authorities. *Id.* No comment, direction, or suggestion is being made about whether Alli-Balogun should be deported, or the parties' rights of appeal should he be deported. *Id.*

The Sentencing Commission's "special instruction," dictating the earliest release date of prisoners regardless of whether the terms of their sentence have been fulfilled, conflicts with the mandate of section 3553(a) of title 18 of the United States Code ("section 3553(a)"), which requires that a court impose a sentence "*sufficient but not greater than necessary.*" 18 U.S.C.

§ 3553(a). The rule of lenity requires reading the "special instruction" favorably to defendant— *i.e.*, permitting release before November 1, 2015.

Alternatively, the court finds that arbitrarily keeping an inmate in prison beyond the period of an appropriate sentence violates his liberty interest and right to procedural due process. The "special instruction," as applied to prisoners who have already fulfilled the term the court intends to impose under the revised guidelines, violates the *ex post facto* clause of the United States Constitution. The clause forbids the enhancement of punishment through the alteration of the substantive formula used to calculate a prisoner's sentence. If there is a lack of penological justification for incarceration, as is the case here, the instruction may amount to ordering cruel and unusual punishment.

Movant's motion for a reduction of his sentence is granted. *See infra* Part III.C.

### B. Motion to Vacate Conviction, 28 U.S.C. § 2255

Alli-Balogun moves to vacate his sentence under section 2255 of title 28 of the United States Code ("2255 petition"), the first motion on that ground since his resentencing. *See* 28 U.S.C. § 2255. He argues ineffective assistance of counsel on multiple grounds and a series of constitutional violations at his trial. *See* 28 U.S.C. § 2255.

This motion is denied. *See infra* Part IV.B.

## II. Facts and Procedural History

### A. Crime of Conviction

Alli-Balogun, a Nigerian citizen lawfully residing in the United States, was arrested on October 8, 1992 on charges that he was involved in an international drug smuggling conspiracy. *See Alli-Balogun v. United States*, 281 F.3d 362, 364 (2d Cir. 2002).

The following facts were elicited at a jury trial started on March 29, 1994 and ended on April 5, 1994 in the Eastern District of New York:

Between April 1991 and May 1992, Alli-Balogun engaged in a conspiracy to import multi-kilogram quantities of heroin into the United States from Thailand. *See United States v. Alli-Balogun*, 72 F.3d 9, 10 (2d Cir. 1995). Some of the conspirators, including defendant, had sources for the drug in Thailand. *Id.* at 11. Other conspirators had contacts through whom they smuggled and distributed heroin into the United States. *Id.* Defendant and his principal co-conspirators pooled their money to purchase heroin. *Id.* The heroin was resold in the United States. *Id.* Their couriers included both men and women. *Id.* Some were prostitutes whose pimps were paid. *Id.* Others were narcotics abusers, or they had sold narcotics on a comparatively small scale. *Id.*

Evidence introduced at trial—procured with the help of cooperating witnesses, including two of defendant's principal co-conspirators—showed that defendant invested in, or intercepted, thirteen heroin importations, involving in excess of thirty kilograms. *Id.* Alli-Balogun used false names to remit money abroad, structuring the remittances to evade currency transaction reporting requirements. *Id.* No evidence was proffered regarding the threat or use of violence, or use or possession of firearms or weapons in furtherance of the conspiracy. *Id.*

Defendant was convicted on five counts: one count of conspiracy to import heroin, 21 U.S.C. §§ 963, 960(b)(3); three counts of importing heroin, 21 U.S.C. §§ 952(a), 960(b)(3); and one count of engaging in a continuing criminal enterprise to import heroin, 21 U.S.C. § 848(a). *See* Jury Verdict, Apr. 5, 1994, ECF No. 65; *cf.* Superseding Indictment, Feb. 24, 1993, ECF No. 19.

**B. Sentencing**

Alli-Balogun was sentenced on March 16, 1995. *See* Sentencing Hearing Transcript, Mar. 16, 1995. It was observed by the court that the conspirators, including defendant, though "relatively small players in this enormous Nigerian smuggling racket that comes through our district," were "cold-blooded businessmen." *Id.* at 13:13, 14:12–13. Finding no basis for a downward departure, it concluded that, without Alli-Balogun's leadership and participation, the conspiracy could not have gone forward. *Id.* at 14:25–15:5.

The total offense level calculated as applicable to defendant was forty-two. *Id.* at 8:8–9. A four-level enhancement was added to the base offense level of thirty-eight because defendant played a leadership role in the conspiracy. *Id.* at 11:8–9. Alli-Balogun was sentenced to a 360-month prison term, the lower end of the then-mandatory guidelines range. *See* Judgment, Mar. 22, 1995, ECF No. 81.

**1. Appeal**

An appeal to the Court of Appeals for the Second Circuit was taken on March 22, 1995. *See* Notice of Appeal, No. 92-CR-1108, Mar. 22, 1995, ECF No. 82. Defendant filed a *pro se* supplemental brief alleging that: (1) his trial counsel failed to argue that Alli-Balogun's role in the conspiracy was minimal and therefore inconsistent with the elements necessary to establish a conviction for engaging in a continuing criminal enterprise; (2) the trial court erred in admitting prior bad act evidence; and (3) the trial court committed plain error when it failed to give a unanimity instruction on the three predicate violations required under the continuing criminal enterprise statute. *See Pro Se* Brief for Defendant-Appellant, *United States v. Alli-Balogun*, 72 F.3d 9, 10 (2d Cir. 1995) (No. 95-1161), 1995 WL 17202081, at *12, 19, 21–23.

Affirming the conviction and sentence, on November 15, 1995, the Court of Appeals for

the Second Circuit wrote:

> After an eleven-month investigation into the activities of a heroin
> smuggling ring, . . . Alli-Balogun . . . was arrested and charged
> with engaging in a continuing criminal enterprise to import heroin,
> conspiring to import heroin, and importing heroin.  At trial, the
> government showed that six "investors" provided varying amounts
> of money for each [of the thirteen] smuggling trip[s] . . .  At least
> twenty-two kilograms of heroin were successfully smuggled
> through these trips.  The evidence adduced at trial to show
> Balogun's participation in the smuggling ring was overwhelming.

*Alli-Balogun*, 72 F.3d at 10.

## 2.  Collateral Attacks

At the district court level, Alli-Balogun mounted three unsuccessful *pro se* collateral

attacks.

During the pendency of his direct appeal, he filed his first 2255 petition.  *See* Petition,

No. 94-CV-4790, ECF No. 1.  Lacking jurisdiction, the court dismissed the petition.  *See* Order,

Oct. 20, 1995, ECF No. 4.  Reconsidered at petitioner's request, on November 14, 1995, it was

again denied due to the pendency of petitioner's appeal.  *See* Order, Nov. 17, 1995, ECF No. 5.

On December 30, 1996, Alli-Balogun's second petition was dismissed on the merits

because the issues "[had] been, or should have been, previously raised."  *See* Petition, No. 96-

CV-6362, Dec. 30, 1996, ECF No. 1; Order, Mar. 10, 1997, ECF No. 9.  An appeal was taken on

March 26, 1997.  *See* Notice of Appeal, Mar. 26, 1997, ECF No. 11.  The mandate issued by the

Court of Appeals for the Second Circuit on January 5, 1998 read:

> The appellant has failed to make a "substantial showing of the
> denial of a constitutional right."    Appellant's claims are
> procedurally barred.  Moreover, Appellant failed to show that his
> sentencing and appellate counsel was ineffective within the

meaning of *Strickland v. Washington*, 466 U.S. 668, 688–96 (1984).

Mandate, Jan. 5, 1998, ECF No. 15.

A third 2255 petition was filed on October 13, 1998. *See* Petition, No. 92-CR-1108, Oct. 13, 1998, ECF No. 94. On December 1, 1998, the petition was denied. *See* Order, Dec. 1, 1998, ECF No. 98. Affirming the denial by the district court, on April 9, 1999, the Court of Appeals for the Second Circuit issued the following mandate: "A motion for authorization to file a second or successive 28 U.S.C. § 2255 . . . is denied. Petitioner has not shown that the successive petition relies on newly discovered evidence or involves [a] new rule of constitutional law." Mandate, Apr. 9, 1999, ECF No. 103.

Five months later, on September 14, 1999, the Court of Appeals for the Second Circuit denied petitioner's request "for an order authorizing consideration of a second petition" because the motion was "not based on either newly discovered evidence or a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court[.]" Mandate, Sept. 14, 1999, No. 94-CV-4790, ECF No. 8.

## C. Resentencing

In the interim, on June 1, 1999, the Supreme Court ruled that, in prosecutions under the continuing criminal enterprise statute, the jury must make a unanimous finding as to each predicate violation. *See Richardson v. United States*, 526 U.S. 813, 817 (1999). Alli-Balogun moved for post-conviction *habeas corpus* relief under section 2241 of title 28 of the United States Code. *See* Motion, No. 92-CR-1108, Aug. 7, 2000, ECF No. 104. Vacated by the district court was the count of conviction covering his participation in a continuing criminal enterprise. *See* Judgment, July 3, 2001, ECF No. 117.

Pursuant to the trial court's order, petitioner was resentenced on March 11, 2002. *See* Resentencing Hr'g. The base level offense was still thirty-eight, based on the quantity of drugs at issue under the then-mandatory guidelines. *Id.* at 15:21. Although a four-level enhancement was added to the base offense level due to the leadership role played by petitioner in the conspiracy, petitioner was afforded a three-level reduction for acceptance of responsibility. *Id.* at 14:24–25. The argument was accepted that "Alli-Balogun had gone to trial because of the presence of the [continuing criminal enterprise] charge and that having vacated the conviction on that count, it now was appropriate for the Court to afford the acceptance of responsibility [three]-level reduction." *Id.* The adjusted sentencing offense level was thirty-nine, yielding an imprisonment guidelines range of 262–327 months. *Id.* at 15:18.

Defendant was resentenced to 327 months, thirty-three months fewer than before. *Id.* at 15:13–16. The court explained: "I will sentence him to the top of the range which is 327. I select the top of the range because this was one of the worst conspiracies with respect to international drug smuggling that the Court observed." *Id.* at 17:2–5. "I observed the full trial. [Alli-Balogun] was an organizer and leader of an international, very widespread and cruel system of utilizing women from all over the United States, in various countries in a well thought-out program for which he is himself entirely responsible." *Id.* at 15:8–13. An amendment judgment was issued on March 18, 2002. *See* Amended Judgment, Mar. 18, 2002, ECF No. 127.

### 1. Appeal and *Crosby* Remand

Defendant appealed the resentencing determination on April 1, 2002. *See* Notice of Appeal, Apr. 1, 2002, ECF No. 135. The appeal still undecided on September 14, 2007, the Court of Appeals for the Second Circuit remanded the case for a determination under *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). *See* Order of United States Court of Appeals,

Sept. 21, 2007, ECF No. 141. *Crosby* held that, in pre-*Booker* cases, a remand should be afforded to determine whether the defendant should be resentenced pursuant to the advisory guidelines regime. *See Crosby*, 397 F.3d at 120.

On remand, at a September 23, 2009 hearing, against the advice of his counsel, defendant affirmatively waived any right to a hearing or resentencing under *Crosby*. *See* Minute Entry, Sept. 23, 2009, ECF No. 163. Alli-Balogun was not resentenced. *Id.*

## 2. Reinstatement of Appeal

Counsel, at the behest of his client, reinstituted the April 1, 2002 appeal. He argued that defendant's original trial counsel was ineffective for failing to make specified arguments at a suppression hearing, and that his client's resentencing in 2002 was procedurally unreasonable because the judge failed to adequately explain the chosen sentence. *See* Brief for Defendant-Appellant, *United States v. Alli-Balogun*, 480 F. App'x 27 (2d Cir. 2011) (No. 10-1834), 2011 WL 1977751, at *25, 35. It was contended that the mandate issued by the Court of Appeals in 1998 did not foreclose previously unasserted grounds with respect to ineffective assistance of counsel. *Id.* at *25.

A variety of *pro se* challenges were raised on appeal as well. *See Pro Se* Supplemental Brief of Defendant-Appellant, *United States v. Alli-Balogun*, No. 10-1834 (2d Cir. June 8, 2011), ECF No. 57. They included opposition to: (1) the district court's denial of Alli-Balogun's 2255 petition before judgment was entered; (2) the denial of a motion to suppress evidence and dismiss the indictment, or, alternatively, to grant a new trial; (3) the admission of a litany of evidence; (4) the jury instructions; (5) the prosecutor's conduct at trial; (6) the sentence imposed; (7) appellate counsel's decision to not raise certain arguments on defendant's first appeal; and

(8) trial counsel's conflict of interest, and trial strategy, which precluded defendant and other

defense witnesses from testifying. *Id.*

Resolving the merits of "all" of Alli-Balogun's counseled and *pro se* contentions, on May

4, 2012, affirming the judgment of the district court, the Court of Appeals for the Second Circuit

issued the following full analysis of Alli-Balogun's position in a summary order:

> Alli-Balogun's first counseled argument is that his lawyer in the 1993 suppression hearing was constitutionally ineffective for failing to argue that the . . . search of his business violated the Fourth Amendment because his wife's consent thereto was involuntarily given. Although a criminal defendant may sometimes raise an ineffective assistance of counsel claim on direct appeal if the record is sufficiently developed, and if he does not raise such a claim on direct appeal, he may raise it in a habeas petition, Alli-Balogun did not do either. He now attacks the actions of his 1993 counsel, whom he fired in 1994 and who was not involved in his 1995 appeal or any later proceeding. Alli-Balogun was represented by new counsel in connection with his 1999 habeas petition that raised other grounds; but his [ineffective assistance of counsel] claim has never been presented to the district court. Because it is raised for the first time on this appeal, it is reviewable at most for plain error.
>
> . . . Alli-Balogun has not met this standard because he has not shown constitutionally deficient assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). A *Strickland* claim requires showing both that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." But Alli-Balogun cannot meet the second *Strickland* prong because the suppression arguments he now claims his counsel should have made are meritless.
>
> At the . . . suppression hearing, Special Agent Patrick Ahearne, who had conducted the 1992 search, testified that Alli-Balogun's wife, Kehinde Badmus, had consented to the search of his business. Alli-Balogun now argues that his counsel should have objected to Ms. Badmus's consent because a group of several agents made a "show of authority" by announcing themselves as

police and by momentarily entering a few steps into the apartment before Ms. Badmus consented. But the evidence shows that Ms. Badmus was "relaxed" and that she did not hesitate to give her consent. There is no indication of force or intimidation—Ahearne calmly knocked and announced "police," after which Ms. Badmus opened the door, and although Ahearne stepped inside, Ms. Badmus consented almost immediately. Under the totality of the circumstances, including the fact that Ms. Badmus was an adult, the ordinary time of day, the business setting of the search, her sound mental and emotional condition, and her ready acquiescence, there is no reasonable probability that the district court would have found her consent involuntary if defense counsel had made the arguments Alli-Balogun now claims should have been made. In any event, given Agent Ahearne's testimony, it is entirely understandable that Alli-Balogun's counsel made the strategic decision to focus on a narrower ground—the scope of Ms. Badmus's consent. *Strickland* grants no license to question counsel's strategic decisions. We thus find no error, plain or otherwise, on the ineffective assistance claim.

Alli-Balogun's second counseled argument challenges the procedural reasonableness of his 2002 resentencing. He argues that Judge Weinstein did not adequately explain the reasons for his revised 327-month sentence. This argument is also meritless. Under [section] 3553(c) [of title 18 of the United States Code], a district court must explain the reasons for the sentence it selected. But the district court need only give an explanation that satisfies the appellate court "that [the district court] has 'considered the parties' arguments' and that it has a 'reasoned basis for exercising [its] own legal decisionmaking authority.'" Here, Alli-Balogun did not contemporaneously object to the judge's explanation of the sentence, so we review only for plain error. Again we find none. Judge Weinstein explained that he selected the sentence, which fell at the top of the then-mandatory guidelines range, because Alli-Balogun's crime was "one of the worst conspiracies with respect to international drug smuggling that the Court observed." Judge Weinstein recalled that he had presided over the 1994 trial and 1995 sentencing and that Alli-Balogun was "an organizer and leader of an international, very widespread and cruel system" of using women, including prostitutes, from all over the world as drug couriers.

Alli-Balogun argues that this reasoning is facially inconsistent with Judge Weinstein's statement at the original 1995 sentencing that "20 years [was] plenty" for the charge, but when that remark is

read in its full context, there is no inconsistency. At the 1995 sentencing, the judge went on to say that "I don't agree with you that Congress would have been happy to [see] him get 20," and that the conspiracy was "particularly cold blooded" in its "nefarious activities" and well-organized investment hierarchy. The judge expressed concern about the fact that Alli-Balogun had transformed from a "respected businessman" to a "critical leader" and "central figure" in the conspiracy, which could not have gone forward without him. The court then imposed the original 360-month sentence. The district court's rationale for its 2002 sentence was thus not inconsistent with its discussion in 1995.

Because Alli-Balogun affirmatively waived any questions related to mandatory guidelines application by waiving a *Crosby* hearing, any objection to Judge Weinstein's apparent reliance in 2002 on the guidelines range has been waived. The court's imposition of a sentence at the top of the range based on the reasons it gave was not error, let alone plain error.

Finally, Alli-Balogun makes a number of *pro se* arguments. Most of these arguments—including his attacks on evidentiary rulings and jury instructions at trial, alleged misconduct by the prosecutor and defense counsel, the court's failure to dismiss the indictment, and the denial of the suppression motion—are barred by the law of the case doctrine. The law of the case doctrine "ordinarily prohibits a party, upon resentencing or an appeal from that resentencing, from raising issues that he or she waived by not litigating them at the time of the initial sentencing." The doctrine also bars, *a fortiori*, arguments that a party did raise previously without success. This matter is now before this Court only because of Alli-Balogun's 2002 resentencing; correlatively, Alli-Balogun may now raise only arguments relating to that resentencing, not arguments attacking his 1994 conviction. The remaining *pro se* arguments are waived by his waiver of the *Crosby* hearing or are not properly before us because they relate to separate collateral proceedings in the district court. Alli-Balogun's attack on the district court's jurisdiction based on a defect in the indictment is also meritless. Alleged errors in the indictment are not "jurisdictional" and are subject to the same law of the case principles set forth above.

Mandate 3–7, Oct. 1, 2012, ECF No. 181 (internal citations omitted).

Alli-Balogun's *pro se* petition for a rehearing *en banc* was denied on September 24, 2012. *See* Order, *United States v. Alli-Balogun*, No. 10-1834 (2d Cir. Sept. 24, 2012), ECF No. 171.

No petition for a writ of *certiorari* to the United States Supreme Court was filed.

### D. Instant Motions

#### 1. Motion for Reduction of Sentence, 18 U.S.C. § 3582(c)(2)

On May 8, 2015, movant submitted a letter motion to the court requesting a reduction of sentence pursuant to section 3582(c)(2) of title 18 of the United States Code ("section 3582(c)(2)"). *See* Motion to Reduce Sentence, No. 92-CR-1108, May 8, 2015, ECF No. 183. The request was made following amendment 788 to the guidelines, which was effective November 1, 2014. *Id.* at 1. It made retroactive the application of amendment 782 to the guidelines, reducing "by two levels the sentencing guidelines applicable to most federal drug trafficking offenses." *Id.* Amendments 782 and 788, in conjunction with section 3582(c)(2), it is claimed, "provide[] the [c]ourt with the opportunity to afford a modest reduction to [Alli-Balogun's] previously imposed sentence of 327 months." *Id.* "With the same adjustments, an acceptance of responsibility reduction of three levels and a role enhancement of [four] levels (both as before), Mr. Alli-Balogun's new total adjusted offense level falls to a level of 37, with a sentencing [g]uidelines range of 210–262 months." *Id.* at 3.

Petitioner's counsel informed the court of Alli-Balogun's apparent rehabilitation while in prison as a basis for reduction of his sentence.

> Mr. Alli-Balogun has been a model inmate. He initially was held at the Metropolitan Detention Center, then was transferred to [a prison] near the Canadian border (far from his family) and has spent approximately the last [fourteen] years . . . in New Jersey, where he at least has been able to have more frequent visits with his family. I recently had the opportunity to meet with Mr. Alli-

16

Balogun . . . . I can say without equivocation that he is a humbled human being. In my respectful view, all that society could have wanted to accomplish by imprisoning Mr. Alli-Balogun for these many year[s] has been accomplished.

He works 6 days per week . . . as a barber cutting hair. He works from about 7:45 a.m. to 2:00 p.m. each day. His institutional work history is good. He has taken advantage of the institution's programs available to him. There have been no disciplinary incidents . . . . More remarkably, however, . . . Mr. Alli-Balogun has been able to maintain a supportive and loving relationship with his wife and four children, all of whom, with Mr. Alli-Balogun's love and encouragement, have been quite successful in their own right, notwithstanding Mr. Alli-Balogun's painful absence from their lives.

Mr. Alli-Balogun's wife, Antonia, is an accountant and works full-time. His daughter Kafayat (age 37) has a Bachelor of Science degree in psychology and works full-time; his son Afeez (age 33) has a college degree and works in finance; his daughter Halimat (age 29) has a degree in business administration and is now studying to be a nurse; and his son Hassan (age 25) works in finance and is completing a degree program in business administration. The successes of Mr. Alli-Balogun's family are a credit to them and to him. Mr. Alli-Balogun himself has a degree in architecture and was working in that field at the time of his incarceration in 1992.

All of the rehabilitative goals of [section] 3553(a) have been accomplished and there will be no undermining of the public's confidence in the administration of justice should the Court grant this modest sentencing reduction. Mr. Alli-Balogun's incarceration for over [twenty-two] and one-half years has accomplished all of the goals of sentencing.

For his own part, even if his sentence is reduced as requested herein, Mr. Alli-Balogun still will face uncertainty and the possibility of removal from the United States to Nigeria, his country of origin, the now civil war-torn and terror-filled world of Boko Horan and other extremists. It also is likely that he will be held in an immigration detention facility after his releases on this case while the immigration administrative process unfolds.

*Id.* at 3–4; *see also* Inmate Skills Development Plan Progress Report, May 8, 2015, ECF No. 183-2.

A hearing addressing the motion for a reduction in sentence was conducted on May 14, 2015. *See* Hearing Transcript, May 14, 2015 ("Hr'g Tr., May 14, 2015"). Further briefing was ordered regarding the binding nature of the November 1, 2015 earliest prisoner release date. The date was promulgated by the Sentencing Commission with respect to amendments 782 and 788, and appeared in section 1B1.10(e) of the guidelines as a "special instruction" limiting the court's resentencing power under section 3582(c)(2) of title 18 of the United States Code. *Id.* at 18:20–19:11, 20:24–21:3. The instruction reads as follows:

> (e)    Special Instruction.—
>
> > (1)    The court shall not order a reduced term of imprisonment based on Amendment 782 unless the effective date of the court's order is November 1, 2015, or later.

U.S.S.G. § 1B1.10(e).

Briefing on the binding effect of the special instruction was complete on June 12, 2015. A resentencing hearing was held on July 15, 2015. *See* Hr'g Tr., July 15, 2015.

## 2. Motion to Vacate Conviction, 28 U.S.C. § 2255

On December 31, 2013, petitioner resubmitted a collection of papers previously filed on various matters concerning his criminal case. *See* Motion to Vacate, Set Aside or Correct Sentence, No. 13-CV-7423, Dec. 31, 2013, ECF No. 1. No specific claim was articulated. *Id.* The government's petition to dismiss these papers styled as a *habeas corpus* petition was granted. *See* Order on Motion to Vacate, Feb. 14, 2014, ECF No. 8.

Alli-Balogun moved for reconsideration. *See* Motion for Reconsideration of the Court's Order on Motion to Vacate, Set Aside or Correct Sentence, Mar. 6, 2014, ECF No. 9. On May

29, 2014, he submitted papers supporting claims on which the instant petition is based. *See* Memorandum of Facts in Support of Motion for Reconsideration, May 29, 2014, ECF No. 15; Alli-Balogun Affidavit in Support of Motion for Reconsideration, May 29, 2014, ECF No. 17; Mrs. Alli-Balogun Affidavit, May 29, 2014, ECF No. 18.

On June 27, 2014, a hearing was conducted at which it was decided that additional briefing was required. *See* Minute Entry, June 27, 2014, ECF No. 20.

After repeated delays, petitioner submitted a memorandum in support of the motion for reconsideration on May 13, 2015. *See* Memorandum in Support of Motion for Reconsideration, May 13, 2015, ECF No. 27. The memorandum included the following arguments:

*First*, that Alli-Balogun received ineffective assistance of counsel in plea negotiations because his counsel (1) did not investigate the case; (2) gave erroneous advice regarding proffers and the use of those statements by the government; (3) failed to advise petitioner regarding the immigration consequences of his prosecution; and (4) advised him that after proffering he would receive a sentence of probation. *Id.* at 7. Asserted was: "but for counsel's errors and bad advice, the outcome of the proceedings would have been different." *Id.* Effective counsel, it was argued, would have negotiated a cooperation agreement and moved for dismissal of the indictment due to the government's breach of proffer agreements. *Id.* at 7–8.

*Second*, that trial counsel was ineffective with respect to a suppression motion because she failed to argue that consent was procured based on coercion and threats. *Id.* at 8.

*Third*, that trial counsel's failure to call Alli-Balogun's wife, cousin, and experts as witnesses prevented petitioner from being able to contradict the testimony of other government cooperating witnesses. *Id.* Also questioned was trial counsel's conduct at trial, including her failure to (1) advise petitioner of his right to testify; (2) object to the district court's instruction to

the jury regarding alternative theories of guilt; and (3) object to testimony, evidence, and charts used at trial. *Id.* at 9.

*Fourth*, that trial counsel failed to challenge the validity and sufficiency of the evidence to support the indictment or seek its dismissal. *Id.* at 8.

*Fifth*, that evidence introduced had been illegally seized. *Id.* at 9.

*Sixth*, that petitioner was detained without having been read his *Miranda* rights. *Id.* Added are arguments about the vindictive nature of his prosecution. *Id.*

*Seventh*, that petitioner's resentence was flawed on multiple grounds, including appellate counsel's decision to seek a *Crosby* remand hearing. *Id.* at 9–10.

*Eighth*, that appellate counsel assigned to petitioner's second appeal was ineffective because he failed to correct errors of previous counsel. *Id.* at 10.

A supplemental *pro se* 404-page memorandum, realleging numerous claims already considered and denied by this court or the Court of Appeals for the Second Circuit, was filed on June 5, 2015. *See* Further Memorandum Prepared *Pro Se* By Petitioner Hakeem Alli-Balogun Regarding His § 2255 Petition, June 5, 2015, ECF No. 33; *see also* Hr'g Tr. 10:17, May 14, 2015.

## III. Motion for Reduction of Sentence, 18 U.S.C. § 3582(c)(2)

### A. Underlying Statutes, Background Principles and Precedent

#### 1. Statutory Authority

The limits on the power of the district court to reduce terms of imprisonment is set out in section 3582(c)(2) of title 18 of the United States Code. *See* 18 U.S.C. § 3582(c)(2). It reads in relevant part:

> The court may not modify a term of imprisonment once it has been imposed except that . . . in the case of a defendant who has been

> sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to [section] 994(o) [of title 28 of the United States Code], upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, *the court may reduce the term of imprisonment,* after considering the factors set forth in section 3553(a) to the extent that they are applicable, *if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.*

*Id.* (emphasis added).

In 1983, Congress emphasized that sentencing power should be in the hands of the judiciary, describing the purpose of the provisions falling under section 3582(c) as "safety valves."

> The value of the forms of "safety valves" contained in this subsection lies in the fact that they assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and to respond to changes in the guidelines. *The approach taken keeps the sentencing power in the judiciary where it belongs*, yet permits later review of sentences in particularly compelling situations."

Senate Report of the Committee on the Judiciary on Section 1762 of the Comprehensive Crime Control Act of 1983, S. Rep. No. 98-225, at 121 (1st Sess. 1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 1983 (emphasis added).

The role of the Sentencing Commission with respect to guidelines revisions is described in section 994(o) of title 28.  *See* 28 U.S.C. § 994(o).  It reads:

> The Commission periodically shall review and revise, in consideration of comments and data coming to its attention, the guidelines promulgated pursuant to the provisions of this section. In fulfilling its duties and in exercising its powers, the Commission shall consult with authorities on, and individual and institutional representatives of, various aspects of the Federal criminal justice system.  The United States Probation System, the Bureau of Prisons, the Judicial Conference of the United States, the Criminal Division of the United States Department of Justice, and a

representative of the Federal Public Defenders shall submit to the Commission any observations, comments, or questions pertinent to the work of the Commission whenever they believe such communication would be useful, and shall, at least annually, submit to the Commission a written report commenting on the operation of the Commission's guidelines, suggesting changes in the guidelines that appear to be warranted, and otherwise assessing the Commission's work.

*Id.*

In section 994(u) of the same title, Congress limits the Commission's power to retroactively reduce sentences by requiring it to "specify in what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for [an] offense may be reduced." 28 U.S.C. § 994(u).

The Court of Appeals for the Second Circuit has held that in section 994(a)(2) "Congress prescribed the specific tool—policy statements—for the Commission to use in regulating the retroactive effect of sentencing." *United States v. Erskine*, 717 F.3d 131, 139 (2013) (citations and internal quotation marks omitted) (holding that Sentencing Commission has statutory authority to prohibit sentences imposed upon resentencing to be reduced to a term less than the minimum of the amended guidelines range). The court explained the role of the Commission's "policy statements" in regulating the retroactive effect of sentencing as follows: "[They] must further the purposes set forth in [section] 3553(a)(2) [of title 18 and section] 994(a)(2) [of title 28], such as the need for a sentence to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant." *Id.* at 139 (citations and internal quotation marks omitted); *see also* 28 U.S.C. § 994(a)(2)(C) ("The Commission . . . pursuant to its rules and regulations and consistent with all pertinent provisions of any Federal statute shall promulgate and distribute to all courts of the United States and to the United States Probation

System . . . general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in section 3552(a)(2) of title 18, United States Code, including the appropriate use of . . . the sentence modification provision[] set forth in section[] . . . 3582(c) of title 18."); 28 U.S.C. § 994(a)(1) ("The Commission . . . pursuant to its rules and regulations and consistent with all pertinent provisions of any Federal statute shall promulgate and distribute to all courts of the United States and to the United States Probation System . . . guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case[.]").

### 2. Role of Sentencing Commission and Powers Delegated To It

Created in 1984 under the Sentencing Reform Act, a chapter of the Comprehensive Crime Control Act of 1984, the Sentencing Commission was charged with "the task of establishing sentencing policies and practices for the Federal criminal justice system." *Stinson v. United States*, 508 U.S. 36, 40–41 (1993) (citations and internal quotation marks omitted) (holding that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"); *United States v. Cramer*, 777 F.3d 597, 604 (2d Cir. 2015) (same). Through the Act, Congress "sought to increase transparency, uniformity, and proportionality in sentencing." *Dorsey v. United States*, 132 S. Ct. 2321, 2326 (2012) (citing U.S.S.G. § 1A1.3 (2011 ed.); 28 U.S.C. §§ 991(b)(1), 994(f)). To meet these goals, "[t]he Act abandoned indeterminate sentencing and parole in favor of a system in which Sentencing Guidelines, promulgated by a new Sentencing Commission, would provide courts with a range of determinate sentences for categories of offenses and defendants." *Tapia v. United States*, 131 S. Ct. 2382, 2387 (2011); *see also Neal v. United States*, 516 U.S. 284, 290 (1996) ("The

23

Commission was born of congressional disenchantment with the vagaries of federal sentencing and of the parole system."); Kenneth R. Feinberg, *Federal Criminal Sentencing Reform: Congress and the United States Sentencing Commission*, 28 Wake Forest L. Rev. 291 (1993) (explaining, in general, how the Sentencing Commission was created).

The Commission executed its primary functions by promulgating the guidelines manual. *Stinson*, 508 U.S. at 41. The manual contains "three varieties" of "text":

> *First*[,] is a guideline provision itself[,] . . . provid[ing] direction as to the appropriate type of punishment—probation, fine, or term of imprisonment—and the extent of the punishment imposed. Amendments to the Guidelines must be submitted to Congress for a [six]-month period of review, during which Congress can modify or disapprove them.
>
> [*Second*,] . . . is a policy statement. The Sentencing Reform Act authorizes the promulgation of general policy statements regarding application of the guidelines or other aspects of sentencing that would further the purposes of the Act.
>
> [*Third*,] is commentary . . . . [B]oth guidelines and policy statements are accompanied by extensive commentary. Although the Sentencing Reform Act does not in express terms authorize the issuance of commentary, the Act, [under section 3553(b) of title 18] does refer to . . . [the] official commentary of the Sentencing Commission[.]

*Id.* at 41 (internal quotations marks and citations omitted) (paragraph breaks added).

In *Mistretta*, the Supreme Court upheld the constitutionality of the Commission's guidelines work. *Mistretta v. United States*, 488 U.S. 361, 379 (1989) (holding that sentencing guidelines were constitutional, amounting to neither excessive delegation of legislative power nor violation of separation of powers principles). Clarified was that the specific policy directives stated in the Sentencing Reform Act of 1984 embodied "intelligible principles" sufficient to communicate to the Commission the limits of its authority. *Id.* at 372. It was recognized that

such "intelligible principles" may be broad in scope because "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."  *Id*.; *see also Erskine*, 717 F.3d at 139 ("[T]hough it is the Commission that crafts the policy statements, it is Congress that has made them both available as a general matter and binding on the courts that employ them.").

Despite Justice Scalia's vehement dissent, in which he referred to the Commission as "a sort of junior varsity Congress," the Court rejected the contention that the Commission's rule-making authority—binding on article III courts—violated separation of powers principles. *Mistretta*, 488 U.S. at 385.  Congress, the majority found, did not exceed its authority in delegating legislative powers to the Commission, which was treated effectively as a unit in the judiciary.  *Id.*  The framers of the Constitution "did not require—and indeed rejected—the notion that the three [b]ranches must be entirely separate and distinct."  *Id.* at 380.  To determine what one branch may do "in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental coordination."  *Id*. at 372.

The Sentencing Commission was described as "a peculiar institution within the framework of our Government."  *Id*. at 384.  With respect to its placement in the judicial branch, the Court wrote:

> Although placed . . . in the Judicial Branch, it is not a court and does not exercise judicial power.  Rather, the Commission is an *independent* body comprised of seven voting members including at least three federal judges, entrusted by Congress with the primary task of promulgating sentencing guidelines.  Our constitutional principles of separated powers are not violated, however, by mere anomaly or innovation.  . . .  Congress' decision to create an

independent rulemaking body to promulgate sentencing guidelines and to locate that body within the Judicial Branch is not unconstitutional unless Congress has vested in the Commission powers that are more appropriately performed by the other Branches or that undermine the integrity of the Judiciary.

. . .

[T]he practical consequences of locating the Commission within the Judicial Branch pose[s] no threat of undermining the integrity of the Judicial Branch or of expanding the powers of the Judiciary beyond constitutional bounds by uniting within the Branch the political or quasi-legislative power of the Commission with the judicial power of the courts. [The Commission's] powers are not united with the powers of the Judiciary in a way that has meaning for separation-of-powers analysis. Whatever constitutional problems might arise if the powers of the Commission were vested in a court, the Commission is not a court, does not exercise judicial power, and is not controlled by or accountable to members of the Judicial Branch.

*Id.* at 384–85, 393 (emphasis added) (internal citations omitted).

In *Booker*, where the Court downgraded the guidelines control of sentencing judges from mandatory to advisory, it reiterated Congress's power to create the Commission:

[T]he promulgation of the Guidelines was much like other activities in the Judicial Branch, such as the creation of the Federal Rules of Evidence, all of which are nonadjudicatory activities. Congress may delegate to the Judicial Branch nonadjudicatory functions that do not trench upon the prerogatives of another Branch and that are appropriate to the central mission of the Judiciary. While . . . the Guidelines [are] more substantive than the Rules of Evidence or other nonadjudicatory functions delegated to the Judicial Branch . . . delegat[ing] [to the Commission the power to create the Guidelines] did not exceed Congress' powers. . . . [A] recognition that the Commission d[oes] not exercise judicial authority, but [is] more properly thought of as exercising some sort of legislation power was essential to our holding [in *Mistretta*].

. . .

[T]he Commission is an independent agency that exercises policymaking authority delegated to it by Congress.

*United States v. Booker*, 543 U.S. 220, 242–43 (2005).

*Dillon*, the Court's most recent opinion regarding the limited binding nature on the courts

of policy statements issued by the Commission, summarized the history and the role of the

Commission as follows:

> The Sentencing Reform Act of 1984 . . . established the Sentencing Commission and authorized it to promulgate Sentencing Guidelines and to issue policy statements regarding the Guidelines' application [pursuant to sections 991 and 994(a) of title 18 of the United States Code]. The Act also charged the Commission with periodically reviewing and revising the Guidelines [pursuant to section 994(o) of title 18]. When a revision reduces the Guidelines range for a given offense, the Commission must determine[, under section 994(u),] in what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for the offense may be reduced.

> As enacted, the [Sentencing Reform Act] made the Sentencing Guidelines binding. Except in limited circumstances, district courts lacked discretion to depart from the Guidelines range. Under that regime, facts found by a judge by a preponderance of the evidence often increased the mandatory Guidelines range and permitted the judge to impose a sentence greater than that supported by the facts established by the jury verdict or guilty plea. We held in *Booker* that treating the Guidelines as mandatory in these circumstances violated the Sixth Amendment right of criminal defendants to be tried by a jury and to have every element of an offense proved by the Government beyond a reasonable doubt.

> To remedy the constitutional problem, we rendered the Guidelines advisory by invalidating two provisions of the [Sentencing Reform Act]: [The first] generally required a sentencing court to impose a sentence within the applicable Guidelines range, and [the second] prescribed the standard of review on appeal, including *de novo* review of Guidelines departures. With these two sections excised (and statutory cross-references to the two sections consequently invalidated), we held that the remainder of the Act satisfies the Court's constitutional requirements. *Booker* thus left intact other provisions of the [Sentencing Reform Act], including those giving the Commission authority to revise the Guidelines, . . . and to determine when and to what extent a revision will be retroactive[.]

*Dillon v. United States*, 560 U.S. 817, 820–21 (2010) (citations and quotation marks omitted)

(holding that sentence modification proceedings held pursuant to section 3582(c)(2) premised on

retroactive amendments to the sentencing guidelines do not implicate sixth amendment rights).

Justice Stevens issued the following dissent in *Dillon* emphasizing the overriding

approach of the Court in *Booker*, and defending sentencing judges' power to exercise discretion.

*Dillon*, 560 U.S. at 833–35 (Stevens, J., dissenting).  He wrote:

> Today, the Court holds that in this one limited nook of sentencing
> law, the Commission retains the power to bind judges that we
> struck down in *Booker*.  In my view, the Court's decision to treat
> the Commission's policy statement as a mandatory command
> rather than an advisory recommendation is unfaithful to *Booker*.  *It
> is also on dubious constitutional footing, as it permits the
> Commission to exercise a barely constrained form of lawmaking
> authority.*
> . . .
>
> Prior to our decision in *Booker*, the Guidelines were mandatory
> only by virtue of congressional mandate, and not by virtue of
> Commission decree.  Following *Booker*, the Commission's policy
> statement in [section] 1B1.10 took effect in March 2008.  That
> statement . . . is now the only source of binding authority in
> [section] 3582(c)(2) proceedings, as it purports to have the effect
> of reinstating a mandatory Guidelines regime within the context of
> a sentence modification proceeding.  It is now the Commission's
> policy statement, and not an explicit congressional mandate, that
> makes the Guidelines ranges binding under [section] 3582(c)(2).

*Id.* (emphasis added) (internal citations omitted).  Justice Stevens described the Commission's

power to promulgate policy statements such as section 1B1.10 as "the tiniest sliver of lawmaking

power to tie the hands of a district court's exercise of grace under [section] 3582(c)(2)."  *Id.* at

841; *see also, e.g.*, *Erskine*, 717 F.3d at 139, 140–41 (finding policy statements to the guidelines

are not subject to the Administrative Procedure Act and Sentencing Reform Act sufficiently

limits and informs Commission on how to exercise its delegated authority).

### 3. Brief History of Section 1B1.10 of the Sentencing Guidelines

#### a. Inception

Pursuant to the Supreme Court, section 1B1.10 of the Sentencing Guidelines is a "policy statement." *See Dillon*, 560 U.S. at 817 (stating section 1B1.10 is "the relevant policy statement" for section 3582(c)(2)). It is titled "Reduction in Term of Imprisonment as a Result of Amended Guideline Range, Policy Statement." U.S.S.G. § 1B1.10 (2014 ed.). Section 1B1.10 was first adopted on November 1, 1989. *See* U.S.S.G. § 1B1.10 (1989 ed.). It has been amended fifteen times since; first in 1990, and subsequently in 1991, 1992, 1993, 1994, 1995, 1997, 2000, 2003, 2007, twice in 2008, 2011, 2012, and most recently in 2014. *See* U.S.S.G. § 1B1.10 (2014 ed.).

The Supreme Court decided *Dillon* on June 17, 2010. *Dillon*, 560 U.S. at 817. At that time, section 1B1.10 had no "special instruction" limiting time of release from prison. It read as follows:

> Reduction in Term of Imprisonment as a Result of Amended
> Guideline Range (Policy Statement)
>
> (a)  Authority.—
>
>   (1)  In General.—In a case in which a defendant is serving a term of imprisonment, and the guideline range applicable to that defendant has subsequently been lowered as a result of an amendment to the Guidelines Manual listed in subsection (c) below, the court may reduce the defendant's term of imprisonment as provided by 18 U.S.C. § 3582(c)(2). As required by 18 U.S.C. § 3582(c)(2), any such reduction in the defendant's term of imprisonment shall be consistent with this policy statement.
>
>   (2)  Exclusions.—A reduction in the defendant's term of imprisonment is not consistent with this policy statement

and therefore is not authorized under 18 U.S.C. § 3582(c)(2) if—

(A) none of the amendments listed in subsection (c) is applicable to the defendant; or

(B) an amendment listed in subsection (c) does not have the effect of lowering the defendant's applicable guideline range.

(3) <u>Limitation</u>.—Consistent with subsection (b), proceedings under 18 U.S.C. § 3582(c)(2) and this policy statement do not constitute a full resentencing of the defendant.

(b) <u>Determination of Reduction in Term of Imprisonment</u>.—

(1) <u>In General</u>.—In determining whether, and to what extent, a reduction in the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement is warranted, the court shall determine the amended guideline range that would have been applicable to the defendant if the amendment(s) to the guidelines listed in subsection (c) had been in effect at the time the defendant was sentenced. In making such determination, the court shall substitute only the amendments listed in subsection (c) for the corresponding guideline provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected.

(2) <u>Limitations and Prohibition on Extent of Reduction</u>.—

(A) <u>In General</u>.—Except as provided in subdivision (B), the court shall not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range determined under subdivision (1) of this subsection.

(B) <u>Exception</u>.—If the original term of imprisonment imposed was less than the term of imprisonment provided by the guideline range applicable to the defendant at the time of sentencing, a reduction comparably less than the

amended guideline range determined under subdivision (1) of this subsection may be appropriate. However, if the original term of imprisonment constituted a non-guideline sentence pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), a further reduction generally would not be appropriate.

(C) <u>Prohibition</u>.—In no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served.

(c) <u>Covered Amendments</u>.—Amendments covered by this policy statement are listed in Appendix C . . . .

U.S.S.G. § 1B1.10 (2008 ed.).

## b. Substantive Amendments

Since *Dillon*, section 1B1.10 has been amended three times, in 2011, 2012, and 2014.

*See* U.S.S.G. § 1B1.10 (2014 ed.). In 2011, section 1B1.10 was amended as follows:

Amendment: Section 1B1.10(b) is amended in subdivision (2) by striking "<u>Limitations</u>" and inserting "<u>Limitation</u>"; in subdivision (2)(A) by striking "<u>In General</u>" and inserting "<u>Limitation</u>"; in subdivision (2)(B) by inserting "<u>for Substantial Assistance</u>" after "<u>Exception</u>"; by striking "original"; by inserting "pursuant to a government motion to reflect the defendant's substantial assistance to authorities" after "of sentencing"; and by striking the last sentence as follows:

"However, if the original term of imprisonment constituted a non-guideline sentence determined pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), a further reduction generally would not be appropriate."

Section 1B1.10(c) is amended by striking "and"; and by inserting ", and 750 (parts A and C only)" before the period at the end.

U.S.S.G. app. C. amend. 759.

In 2012, the Commission amended note 4 of the commentary to section 1B1.10, replacing "Application Note 10 to §2D1.1" with "the Drug Equivalency Tables in the Commentary to §2D1.1 (*see* § 2D1.1, comment. (n.8))."  U.S.S.G. supplement to app. C. amend. 770.

### c.  2014 Amendments

Two substantive amendments were made to section 1B1.10 in 2014.  *See* U.S.S.G. supplement to app. C. amend. 780 and 788.  The Commission redesignated the former subsection (c) as the new subsection (d).  *Id.*  The newly added subsection reads:

> (c)  <u>Cases Involving Mandatory Minimum Sentences and Substantial Assistance</u>.—If the case involves a statutorily required minimum sentence and the court had the authority to impose a sentence below the statutorily required minimum sentence  pursuant to a government motion to reflect the defendant's substantial assistance  to authorities, then for purposes of this policy statement the amended guideline  range shall be determined without regard to the operation of §5G1.1 (Sentencing on a Single Count of Conviction) and §5G1.2 (Sentencing on Multiple Counts of Conviction).

*Id.*  The Commission made a further amendment to section 1B1.10 in connection with amendment 782, which changed the threshold amounts in the drug quantity tables in sections 2D1.1 and 2D1.11 of the guidelines.  *See* U.S.S.G. supplement to app. C. amend. 782.

For the first time, the Commission *added* a special instruction in 2014.  Amendment 788 made amendment 782 retroactive and altered section 1B1.10 of the guidelines by adding a special limiting instruction, "new subsection (e)."  U.S.S.G. supplement to app. C. amend. 788. This instruction is a critical attempt at imposing mandatory limits on discretion of trial judges.  It reads, as already noted:

     (e)    <u>Special Instruction.</u>—

          (1)    The court shall not order a reduced term of imprisonment based on Amendment 782 unless the *effective date of the court's order is November 1, 2015, or later.*

U.S.S.G. § 1B1.10(e) (emphasis added).

Amendment 788 also amended the "Commentary to 1B1.10 . . . by inserting after Note 5 . . . [a] new Note 6." U.S.S.G. supplement to app. C. amend. 788. It emphasized the Commission's intended ruling force of the November 1, 2015 date. Note 6 reads:

> <u>Application to Amendment 782.</u>—As specified in subsection (d) and (e)(1), Amendment 782 . . . is covered by this policy statement only in the cases in which the order reducing the defendant's term of imprisonment has an effective date of November 1, 2015, or later.

> *A reduction based on retroactive application of Amendment 782 that does not comply with the requirement that the order take effect on November 1, 2015, or later is not consistent with this policy statement and therefore is not authorized under 18 U.S.C. § 3582(c)(2).*

> Subsection (e)(1) does not preclude the court from conducting sentence reduction proceedings and entering orders under 18 U.S.C. § 3582(c)(2) and this policy statement before November 1, 2015, provided that any order reducing the defendant's term of imprisonment has *an effective date of November 1, 2015, or later.*

*Id.* at cmt. 6 (emphasis added).

### i. Reason for Amendment 788

The Supplement to Appendix C of the guidelines discusses the interaction between amendments 782 and 788, both of which became effective on November 1, 2014. *See* U.S.S.G. supplement to app. C. amends. 782 and 788. It pointed out that, as a practical matter, the burden of the many applications to be expected made a delay in release necessary.

> The number of cases potentially involved is large, and the magnitude of the change in the guideline range is significant. The Commission determined that an estimated 46,000 offenders may benefit from retroactive application of Amendment 782 subject to the limitation in § 1B1.10(e), and the average sentence reduction would be approximately 18 percent.

U.S.S.G. supplement to app. C. amend. 788.

The administrative burdens the application of amendment 782 would, the Commission found, impose on the courts, prosecutors, probation and pretrial services, and the Bureau of Prisons, as well as the attendant public safety concerns about the release of thousands of federal drug trafficking offenders, it was concluded, warranted "a one-year delay in the effective date of any order granting sentence reductions under [a]mendment 782." *Id.*

The Commission could have met its concern over burdens on the system, while recognizing the discretion by the trial judges to use an earlier release date after considering concerns or the burden on the system. The normal differences in deciding cases across the country would itself have avoided pouring thousands of prisoners in the nation's streets at one instant. But exercise of any discretion was attempted to be barred by the "special instruction."

### ii. Public Hearing and Vote

At a June 10, 2014 public hearing by the Commission, testimony was heard from witnesses addressing implementation of amendment 788. *See Public Hearing on Retroactivity of 2014 Drug Amendment Before the U.S. Sentencing Commission*, U.S. Sentencing Commission (2014) ("Public Hr'g"). Those witnesses included the Chair of the Criminal Justice Committee of the Judicial Conference, a Deputy Chief United States Probation Officer, the United States Attorney for the Northern District of Georgia, the Director of the United States Bureau of

Prisons, practicing attorneys, representatives of several advocacy groups, and law enforcement representatives. *Id*. at 1–2.

Relevant to the November 1, 2015 delayed release date, the Department of Justice addressed the anticipated impact the immediate release some 4,500 inmates would have on the criminal justice system. *Id*. at 121. Full retroactivity, it explained, would place a significant burden on the courts and probation offices; adding such a large number of inmates back into the community all at once, it reasoned, could have significant public safety implications. *Id.* at 121–22.

Judge Irene M. Keeley, Chair of the Criminal Law Committee of the Judicial Conference, noted that releasing the offenders immediately with "no programming, with no plan for reentry" would "almost guarantee a failure." *Id.* at 24–25, 71; *see also* Judge Irene M. Keeley, Prepared Remarks, Public Hearing on Retroactivity of 2014 Drug Amendment, June 10, 2014 ("The Committee hopes that a six-month delay in cases being released to supervision will allow additional time for the system to be provided needed resources and fill probation officer vacancies. In addition, the additional time will allow the probation and pretrial services system to marshal its existing resources as much as possible, and to minimize the threat to community safety stemming from too many inmates being released without adequate planning and supervision.").

The Director of the United States Bureau of Prisons, Charles E. Samuels, described the substantial task of recalculating new projected release dates, formulating release plans, and arranging for residential reentry center placement for the inmates preparing to reenter society. *See* Public Hr'g 121–24. Assessing the staff and time necessary to execute these tasks, Samuels stated: "The more time we have, the better." *Id.* at 124.

Safety was a prominent consideration of the Department of Justice when it recommended a limited retroactive application of amendment 782:

> Foremost among these other policy considerations to be weighed in the retroactivity analysis is public safety. Because of public safety concerns that arise from the release of dangerous drug offenders, and from the diversion of resources necessary to process over 50,000 inmates, we believe that retroactivity in the drug amendment should be limited to lower-level nonviolent drug offenders without significant criminal histories.
>
> Limited retroactivity will ensure that release decisions for eligible offenders are fully considered *on a case-by-case basis as is required*, and that sufficient supervision and monitoring of released offenders will be accomplished by probation officers, and that the public safety risks to the community are minimized.
>
> In making the retroactivity determination, the Commission should also consider the resources necessary to effectuate retroactivity and the corresponding negative impact on public safety from the resultant diversion of those criminal justice system resources.

*Id.* at 110–12 (emphasis added) (testimony of United States Attorney Sally Quillian).

One month after the public hearing, on July 18, 2014, a vote was held by the Commission on amendment 788. *See* Press Release, U.S. Sentencing Commission, U.S. Sentencing Commission Unanimously Votes to Allow Delayed Retroactive Reduction in Drug Trafficking Sentences (July 18, 2014), *available at* http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140718_press_release.pdf (last accessed June 18, 2015). The Commission's chair stated:

> I believe the proposal we vote on today takes steps that will effectively address those risks, as well as reduce the difficulty of applying the change retroactively. Specifically, under the amendment we vote on today, judges *will be able to begin considering motions to reduce sentences based on retroactive application of the drug amendment this November. However, any order reducing terms of imprisonment cannot be effective until*

> November 1, 2015, meaning that no offenders will actually be
> released early until November 2015.

*See* Chief Judge Patti B. Saris, Chair, United States Sentencing Commission Remarks for Public

Meeting, July 18, 2014, *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-

process/public-hearings-and-meetings/20140718/PM_Chairs_Remarks.pdf (last accessed May

28, 2015) (emphasis added).

Acknowledging "the reasonable concerns we have heard that releasing a large number of

offenders within a short period of time can create risks," Judge Saris explained that the "delayed

implementation" of amendment 782 would address public safety concerns in three ways. *Id.*

> First, it will allow judges more time to consider the initial influx of
> motions for reduced sentences. As we have consistently said,
> retroactive application of this amendment does not automatically
> entitle anyone to a reduced sentence. *Judges will review every
> case to determine whether it is appropriate for a given offender's
> sentence to be reduced.* The delayed implementation we vote on
> today will allow judges time to carefully weigh each case,
> including considering the public safety implications of releasing
> any given offender early, and will give courts enough time to
> obtain and review the information necessary to make an
> individualized determination. In addition, the government will
> have adequate time to access information including regarding
> offenders' conduct in prison and object to sentence reductions
> when prosecutors believe public safety may be at risk. We heard
> testimony from the judiciary that additional time would be
> essential to facilitate the kind of consideration that is required.
> With an estimated 7,953 offenders eligible for release in November
> 2015 under retroactive application of this amendment, this added
> time to consider each case thoroughly will be crucial, particularly
> in those states, like border states, which have huge caseloads.
>
> Second, the delayed implementation will ensure that the Bureau of
> Prisons has enough time to give every offender the usual
> transitional services and opportunities that help increase the
> chances of successful reentry into society. In the regular course,
> many offenders transition from prison to halfway houses or home
> confinement before their ultimate release. Officials from the
> Bureau of Prisons have emphasized that these transitions help

ensure that offenders have the services, support, and skills they need to live productive lives. *We heard testimony in June that, without a period of delay when a guideline reduction was applied retroactively in the past, some offenders were released without a reentry plan and services. The special instruction on timing in the proposed amendment we will vote on today will mean that, this time, no offenders will be released without having had the opportunity for this regular transition.*

Third, the delay will allow the Office of Probation and Pretrial Services adequate time to prepare so that released offenders can be effectively supervised. This delay will allow probation officers to be transferred or hired and trained and allow them to prepare for supervising additional offenders. With time to prepare, the Office of Probation and Pretrial Services will be able to ensure more effective supervision, which will increase the chance of successful offender reentry and help ensure public safety. We have heard from judges and probation officers that additional time for this step is essential to protecting public safety, and today's proposed amendment directly addresses that concern.

*I understand that the special instruction on the effective date of reduced sentences under retroactive application of the drug amendment will reduce somewhat the number of offenders who will benefit. But I believe this limitation is necessary to ease the difficulty in applying the amendment retroactively by enabling appropriate consideration of individual petitions, ensuring sufficient staffing and preparation to effectively supervise offenders upon release, and allowing for effective reentry plans. All of these steps will ultimately help to protect public safety and, we believe, make this delay necessary.*

*Id.* (emphasis added).

### 4. Binding Nature of Section 1B1.10(b) of the Sentencing Guidelines

#### a. Supreme Court

In 2010, the Supreme Court addressed the scope of sentencing proceedings conducted in response to downward adjustments to the sentencing guidelines issued pursuant to section 994(o) of title 28 of the United States Code. *Dillon*, 560 U.S. at 820. It held that a defendant's sixth amendment rights were not violated when the district court considered a reduction only within

the amended guidelines range pursuant to section 1B1.10(b) of the 2008 sentencing guidelines. *Id.* at 817.

In *Dillon*, defendant was convicted for offenses related to possession of crack and powder cocaine as well as use of a firearm. *Id.* at 822. The district court sentenced defendant to the minimum term of imprisonment under the sentencing guidelines. *Id.* at 823. The sentence was affirmed on appeal. *Id.* Twelve years later, the Sentencing Commission retroactively reduced the guidelines for crack cocaine related offenses. *Id.* In response, Dillon moved for a sentence reduction based on the Commission's retroactive measure and his post-sentencing conduct. *Id.* Reduced was his sentence based on the retroactive changes; his post-sentencing behavior was not considered. *Id.* at 823–24. The Court of Appeals for the Third Circuit affirmed. *Id.* at 824.

In the introductory paragraph to its *Dillon* opinion, the Supreme Court underscored that it was not ruling on the constitutionality of section 1B1.10 in its entirety. *Id.* at 819. Instead, it stated: "This case present[s] the question [of] whether our decision in *United States v. Booker*, . . . which rendered the [g]uidelines advisory to remedy the Sixth Amendment problems associated with a mandatory sentencing regime, requires treating *§ 1B1.10(b)* as nonbinding." *Id.* (emphasis added). Concluded was "that *Booker* does not demand that result." *Id.* Subdivision (b) of section 1B1.10, it ruled, was binding on district courts considering a reduction of sentence pursuant to section 3582(c)(2). *Id.*

Writing for the majority, Justice Sotomayor agreed with the lower courts. Analyzing section 3582(c)(2), the Court explained that a reduction in sentence pursuant to an amendment to the sentencing guidelines was limited in scope. *Id.* at 825–26. Any resentence made pursuant to the statute, it found, did not trigger the same constitutional concerns underlying *Booker* or traditional constitutional protections associated with full resentencing hearings. *Id.* at 830. Held

was that the ruling in *Booker*, which rendered the sentencing guidelines and accompanying policy statements advisory—not mandatory—was inapplicable to section 3582(c). *Id.* Retroactively applying reduced guidelines, the Court reasoned, was an act of lenity favoring prisoners. *Id.* at 828.

The Sentencing Commission's authority to make guidelines amendments retroactive and issue binding policy statements was discussed in the following narrow scope addressed to terms of sentences, not dates of release:

> When the Commission makes a Guidelines amendment retroactive, [section] 3582(c)(2) authorizes a district court to reduce an otherwise final sentence that is based on the amended provision. Any reduction must be consistent with applicable policy statements issued by the Sentencing Commission. The relevant policy statement, [subdivision b of section] 1B1.10, instructs courts proceeding under [section] 3582(c)(2) to substitute the amended Guidelines range while leaving all other guideline application decisions unaffected. . . . [A] court may then grant a reduction within the amended Guidelines range if it determines that one is warranted after considering the factors set forth in [section] 3553(a) to the extent that they are applicable. Except in limited circumstances, however, [section] 1B1.10 (b)(2)(A) forecloses a court acting under [section] 3582(c)(2) from reducing a sentence to a term that is less than the minimum of the amended guideline range.

*Id.* at 821–22.

The *Dillon* Court established a "two-step inquiry" to guide a district court in its consideration of section 3582(c)(2) motions: "A court must first determine that a reduction is consistent with [section] 1B1.10 [of the guidelines] before it may consider whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)." *Id.* at 826. The inquiry requires asking: (1) is the defendant eligible for a reduction in sentence; and (2) if so, to what extent, if any, is the reduction warranted under the particular

circumstances of the case?  Under section 3553(a), the court must consider, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need to "protect the public from further crimes of the defendant[.]"  18 U.S.C. § 3553(a). Dates of release or "special instructions" are not addressed in *Dillon*.

### b.  Court of Appeals for the Second Circuit

The Court of Appeals for the Second Circuit, following the dictates of the Supreme Court in *Dillon*, has held that *Booker* and its progeny do not render policy statements made pursuant to subdivision (b) of section 1B1.10 advisory; they are mandatory.  *See United States v. Steele*, 714 F.3d 751, 754 (2d Cir. 2013) ("This rule—namely, resentencings pursuant to § 3582(c)(2) must be consistent with the applicable Guidelines policy statement—is mandatory.  [Section] 3582(c)(2) does not authorize a plenary resentencing proceeding, and the resentencing court must treat the Guidelines as binding—not as "advisory" as it would at a defendant's initial sentencing." (internal quotations marks and citations omitted)); *Erskine*, 717 F.3d at 139 ("Section 1B1.10 was enacted and amended pursuant to the power granted to the Commission . . . .  Thus, Congress has delegated to the Commission the power it exercised both in creating and amending § 1B1.10."); *United States v. Savoy*, 567 F.3d 71, 73–74 (2d Cir. 2009) (holding that if a defendant was originally sentenced within the applicable guidelines range, *Booker* and its progeny do not permit district courts to disregard section 1B1.10(b)(2)(A) of the sentencing guidelines by reducing the defendant's sentence below the amended guidelines range).  Like the Supreme Court, the Court of Appeals for the Second Circuit did not rule on section 1B1.10(e)'s binding effect.

### 5. Binding Nature of Section 1B1.10(e) of the Sentencing Guidelines

#### a. Appellate Courts

To date, three circuit courts of appeals have made mention of section 1B1.10(e) of the guidelines. *See United States v. Lawin*, 779 F.3d 780, 781–82 (8th Cir. 2015); *United States v. Alejandro-Montanez*, 778 F.3d 352, 362 (1st Cir. 2015), *petition for cert filed*, -- U.S.L.W. -- (U.S. May 7, 2015) (No. 14-10073); *United States v. Hayden*, 775 F.3d 847, 850 (7th Cir. 2014). None assessed the degree to which lower courts were bound by the "November 1, 2015" effective date of release. *See Alejandro-Montanez*, 778 F.3d at 362 (remanding administration of sentencing to district court to determine applicability of amendment 782); *Lawin*, 779 F.3d at 781–82 (holding that district court did not abuse its discretion in declining to continue sentencing hearing until proposed amendment 782 went in effect); *Hayden*, 775 F.3d at 850 (finding district court's refusal to give defendant benefit of not-yet-effective amendment 782 did not create unwarranted sentencing disparity).

#### b. District Courts

Two district courts—the Middle District of Florida and the Eastern District of California—have found the "special instruction" binding. *See e.g.*, *United States v. Vergara*, No. 3:10-CR-113-J-32, 2015 WL 867613 (M.D. Fla. Mar. 2, 2015) (rejecting challenges to constitutional and statutory validity of section 1B1.10(e)'s delayed release provision), *appeal docketed*, No. 15-11023 (11th Cir. Mar. 11, 2015); *United States v. Cano*, No. 1:02-CR-5050, 2015 WL 1983152, at *2 (E.D. Cal. May 1, 2015) (denying application for immediate release of non-citizen, finding "special instruction" does not violate separation of powers or impermissibly consider rehabilitative or correctional treatment, and is neither arbitrary nor capricious), *appeal docketed*, No. 15-10255 (9th Cir. May 15, 2015).

In *Vergara*, the court explained that section (e)(1) was enacted "to help the courts,

probation services, and the United States Attorney's [o]ffices cope with the anticipated flood of

[section] 3582(c)(2) motions, as well as to give prisoners time to receive the same transitional

services that other federal inmates receive prior to release." *Id.* at *1 & n.1. In *Espinoza*,

adopted by *Vergara*, the court relied heavily on the Supreme Court's opinion in *Dillon* to reason

that subsection (e) of section 1B1.10 of the guidelines was binding, not mandatory. *Id.* at *1;

*United States v. Espinoza*, No. 8:06-CR-389, 2015 WL 736396, at *2 (M.D. Fla. Feb. 20, 2015)

(denying motion for reduction of sentence to the extent defendant seeks release prior to

November 1, 2015), *appeal docketed*, No. 15-10804 (11th Cir. Feb. 24, 2015).

> The Sentencing Reform Act grants to the Commission the authority to issue binding policy statements concerning the retroactive application of a guidelines amendment. 28 U.S.C. §§ 994(u), 994(a)(2)(C); *Dillon*[,] [560 U.S. at 830]. Congress directed the Commission to specify what circumstances and by what amount the sentences of prisoners serving terms of imprisonment for the offense may be reduced. 28 U.S.C. § 994(u) . . . . Further, Congress has directed that a court order reducing a defendant's sentence in this circumstance be consistent with those policy statements. 18 U.S.C. § 3582(c)(2) . . . .
>
> It follows that the Commission was authorized by statute to promulgate the policy statement in U.S.S.G. § 1B1.10(e), which specifies the circumstances by which Amendment 782 sentence reductions are to be implemented, including the November 1, 2015 delayed release date. *Dillon*[,] [560 U.S. at 825] . . . .

*Id.* at *2–3 (internal quotations marks omitted).

Nine other district courts, including the Eastern District of New York, have issued

rulings, fifty-five in total, applying the "special instruction" as if it were binding, while avoiding

a direct ruling on the issue. *See, e.g.*, *United States v. Parlier*, No. 2:13-CR-0016, 2015 WL

4111478, at *2 (E.D. Tenn. July 8, 2015) (rendering order effective November 2, 2015 and citing

subsection (e)(1) of section 1B1.10 of the guidelines); *United States v. Vazquez*, No. 3:13-CR-70, 2015 WL 3581228, at *2 (D. Conn. June 5, 2015) (staying implementation of sentencing reduction under amendment 782 until November 1, 2015, pursuant to subsection (e)(1)); *United States v. Tyson*, No. 09-CR-0515, 2015 WL 4104791, at *1, *3 (E.D.N.Y. July 7, 2015) (same); *United States v. Featherstun*, No. 05-CR-0021, 2015 WL 2137268, at *1 (E.D. Va. May 7, 2015) (denying defendant's motion for reduction of sentence because his scheduled release on August 14, 2015 precludes the possible application of a sentence reduction under subsection (e)(1) of section 1B1.10 of the guidelines); *United States v. Leland*, No. 1:03-CR-0033, 2015 WL 1809663, at *38 (D. Me. Apr. 21, 2015) (acknowledging that decisions pursuant to amendment 782 may be made immediately, but subsection (e)(1) places time restriction of November 1, 2015); *United States v. Carranza*, No. 08-CR-0792, 2015 WL 1841106, at *3 (S.D.N.Y. Apr. 21, 2015) (staying implementation of sentencing reduction under amendment 782 until November 1, 2015, pursuant to subsection (e)(1)); *United States v. Cardwell*, No. 4:08-CR-0378, 2015 WL 867428, at *2 (E.D. Mo. Feb. 26, 2015) (same); *United States v. Martinez-Cisneros*, No. 07-CR-4084, 2015 WL 505619, at *2 (N.D. Iowa Feb. 6, 2015) (rendering order effective November 2, 2015 and citing subsection (e)(1)); *United States v. Beasley*, No. 89-CR-0602, 2014 WL 6694058, at *3 (N.D. Cal. Nov. 26, 2014) (same).

Two other district courts have referenced subsection (e) of section 1B1.10 of the guidelines as if it were binding, but did not apply it because the motions before them for reductions of sentences were denied or decided on other grounds. *See, e.g.*, *United States v. Delgado*, No. 14-CR-0253, 2015 WL 1034241, at *2 (S.D. Tex. Mar. 10, 2015), *appeal docketed*, No. 15-40411 (5th Cir. Apr. 1, 2015) (motion for reduction of sentence denied because defendant was not sentenced pursuant to drug quantity tables; he had been sentenced as a career

offender); *United States v. Mintz*, No. 1:08-CR-0040, 2014 WL 6680401, at *4 & n.2 (W.D.N.C. Nov. 25, 2014) ("The Defendant in his Motion, explicitly states that he is not attempting to take advantage of Amendment 782 contained within the 2014 version of the Sentencing Guidelines effective November 1, 2014. [Doc. 155 at 1]. Consequently, his release date will not be delayed by the "holding" provisions of U.S.S.G. § 1B1.10(e) (2014).").

## B. Law

### 1. Rule of Lenity

#### a. Generally

"If the statutory language is plain, [it] must [be] enforce[ed] [] according to its terms. *But* oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, No. 14-114, 2015 WL 2473448, at *8 (U.S. June 25, 2015) (emphasis added) (citations and internal quotation marks omitted); *id.* at * 14 (finding that while provision of Affordable Care Act, 42 U.S.C. § 18031, "may seem plain when viewed in isolation, such a reading turns out to be untenable in light of the statute as a whole" (citations and internal quotation marks omitted)). "So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (citations and internal quotation marks omitted).

The rule of lenity provides that when a criminal statute is susceptible of two different interpretations—one more and one less favorable to the defendant—"leniency" requires that the court read it in the manner more favorable to a defendant. *See Rewis v. United States*, 401 U.S. 808, 812 (1971); *United States v. Ford*, 435 F.3d 204, 211 (2d Cir. 2006) (explaining that "restraint must be exercised in defining the breadth of conduct prohibited by a federal criminal

statute out of concerns regarding both the prerogatives of Congress and the need to give fair warning to those whose conduct is affected").

The rule is a principle of statutory construction that resolves ambiguities in a statute in the defendant's favor. *See Lurie v. Wittner*, 228 F.3d 113, 126 (2d Cir. 2000) (noting that "the rule of lenity is a canon of statutory construction, not in itself federal law" (citations omitted)). It comes into play only if and when there is ambiguity. *See United States v. Litchfield*, 986 F.2d 21, 22 (2d Cir. 1993). It should not be viewed as a general principle requiring that clear statutes be applied in a lenient manner. *See Callanan v. United States*, 364 U.S. 587, 596 (1961) (explaining that the rule of lenity, "as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one").

The rule is called upon in "service to protect" constitutional rights. *Lurie*, 228 F.3d at 126. "This maxim of statutory construction . . . cannot dictate an implausible interpretation of a statute, nor one at odds with the generally accepted contemporary meaning of a term." *Taylor v. United States*, 495 U.S. 575, 596 (1990) (citation omitted). The principle prevents giving the words of a criminal statute "a meaning that is different from [their] ordinary, accepted meaning, and that disfavors the defendant." *Burrage v. United States*, 134 S. Ct. 881, 891 (2014) (holding that defendant, who distributed heroin used by victim who died of a drug overdose after also using other drugs, could not be convicted under the penalty enhancement provision, absent evidence that the victim would have lived "but for" his heroin use). When a criminal statute has two possible readings, "the harsher alternative" is not to be chosen unless Congress has "spoken in language that is clear and definite." *United States v. Bass*, 404 U.S. 336, 347 (1971) (citations and internal quotation marks omitted).

When all legitimate tools of interpretation fail to decisively dispel the statute's ambiguity, the rule of lenity is to be applied where "reasonable doubt persists." *Moskal v. United States*, 498 U.S. 103, 108 (1990). "[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendant]'s favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994).

In *Skilling*, for example, the Court addressed the type of conduct encompassed by the ambiguous term "honest services" in section 1346 of title 18 of the United States Code. *Skilling v. United States* 561 U.S. 358, 363 (2010). The statute proscribed depriving another of a right to honest services through fraudulent schemes. *Id.* Reiterated was that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 410. The Supreme Court refused to agree with the government's broad interpretation of the statute, which entailed proscribing "undisclosed self-dealing by a public official or private employee." *Id.* at 409. Limiting coverage of the term "honest services" to bribery and kickback schemes, the Court reasoned that if "Congress desires to go further . . . it must speak more clearly than it has." *Id.* at 412. *But see United States v. DiCristina*, 726 F.3d 92, 104 (2d Cir. 2013) ("A statute is not ambiguous for purposes of lenity merely because it is possible to articulate a construction more narrow than that urged by the Government." (citations and internal quotation marks omitted)), *cert. denied*, 134 S. Ct. 1281 (2014).

### b. As Applied to the Sentencing Context

The Court of Appeals for the Second Circuit has applied the rule of lenity to the calculation of sentences pursuant to the Sentencing Guidelines. *See United States v. Simpson*, 319 F.3d 81, 86–87 (2d Cir. 2002) (holding as a matter of first impression that the rule of lenity is applicable to the sentencing guidelines). "The rule of lenity concerns situations in which a

legislature fails to give notice of the scope of punishment by leaving 'a grievous ambiguity or uncertainty in the language and structure of the [statute], such that even after a court has seized everything from which aid can be derived, it is still left with an ambiguous statute.'" *Sash v. Zenk*, 439 F.3d 61, 64 (2d Cir. 2006) (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991) (holding that it would be inappropriate to apply rule of lenity in order to construe statute calling for five-year mandatory minimum sentence for offense of distributing more than one gram of "mixture or substance containing detectable amount" of LSD in such way that weight of carrier medium is not included when determining appropriate sentencing for trafficking in LSD; straightforward reading of statutes, requiring weight of carrier medium to be included, does not produce result so absurd or glaringly unjust as to raise reasonable doubt in regard to congressional intent)); *see also United States v. Flemming*, 617 F.3d 252, 272 (3d Cir. 2010) ("Application of the rule of lenity is called for . . . .  We conclude that, under a pre-2003 edition of the Sentencing Guidelines, a career offender who is granted a [section] 4A1.3 downward departure to the [c]rack [c]ocaine [g]uidelines range is eligible for a sentence reduction under . . . [section] 3582(c)(2)").  *But cf. Sash*, 439 F.3d at 63, 68 (holding that rule of lenity did not apply to ambiguity in governing calculation of good time credits by Bureau of Prisons) ("[I]n other worlds, the calculation of sentencing credit is not 'criminal' for the purposes of the rule of lenity.").

In *Flemming*, the Court of Appeals for the Third Circuit applied the rule of lenity to narrowly hold that a career offender was not precluded from a reduction in sentence under section 3852(c)(2) pursuant to amendment 706 to the guidelines, which lowered by two levels the base offense level for crack cocaine offenses.  *Flemming*, 617 F.3d at 272.  Defendant had been sentenced in 2005 to 175 months' imprisonment for firearm and crack cocaine offenses.  *Id.*

at 254.  In 2007, the defendant moved for a reduction pursuant to amendment 706.  *Id*. at 256.

The district court denied the motion, reasoning that it lacked authority to reduce the defendant's

sentence because he was technically a career offender under section 4B1.1 of the guidelines.  *Id*.

On appeal, the defendant argued that despite his status as a career offender, he was

eligible for the reduction because, after concluding that the career offender enhancement

overstated the seriousness of his criminal history, the lower court had granted him a downward

departure based on the inadequacy of his criminal history category.  *Id.* at 256–59.  The Court of

Appeals noted that rendering a defendant ineligible for a sentence reduction was antithetical to

the policy concerns that motivated amendment 706.  *Id*. at 272.  The district court's reasoned

judgment that such a classification was inappropriate because it overstated the seriousness of his

criminal history was sound.  *Id.*  Because prior to 2003 "what constituted 'the applicable

guideline range' for a career offender granted a downward departure . . . and sentenced based on

the [c]rack [c]ocaine [g]uidelines range, was, at best, quite unclear," lenity prevailed.  *Id.* at 271–

72.

### 2.  Due Process

#### a.  Generally

The fifth and fourteenth amendments to the United States Constitution, applied to the

federal government and states respectively, provide that no person shall be deprived of "life,

liberty or property, without due process of law."  U.S. Const. amends. V, XIV.  The "due

process" clause under both amendments protects substantive and procedural due process rights.

*See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 564 (2003) (holding statute making it a crime for two

persons of the same sex to engage in certain intimate sexual conduct violated substantive due

process, impinging on the exercise of liberty interests protected by fourteenth amendment);

*United States v. Salerno*, 481 U.S. 739, 747 (1987) (finding that pretrial detention authorized by the Bail Reform Act did not violate substantive due process under the fifth amendment because it was a regulatory rather than punitive measure); *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (explaining that procedural due process under fifth and fourteenth amendments is not a technical conception with fixed content unrelated to time, place and circumstances; rather, it is flexible and calls for such procedural protections as particular situation demands).

"Most prisoner due process cases are brought under section 1983; the others are habeas corpus petitions." Susan N. Herman, *The New Liberty: The Procedural Due Process Rights of Prisoners and Others Under the Burger Court*, 59 N.Y.U. L. Rev. 482, 503 (1984) (citing cases). "Due process is intertwined within [section] 1983 and habeas corpus so extensively that a discussion of either will invariably lead back to the [f]ourteenth [and fifth] [a]mendment[s] and [the Constitution's] recognition of substantive and procedural rights." Richard D. Nguyen, *Skinner v. Switzer: How the Supreme Court Bypassed State Habeas Statutes and Expanded the Civil Liberties of State Prisoners*, 37 T. Marshall L. Rev. 163, 173 (2011).

"[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate government objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citations and internal quotation marks omitted). The phrase "substantive due process" is applied to cases where the due process clause is relied on to bar "certain government actions regardless of the fairness of the procedures used to implement them." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992). Under a substantive due process analysis, the legislature is prohibited

from enacting laws that directly impair fundamental liberty interests.  *See Lawrence*, 539 U.S. at 564.

"Procedural due process," at issue in the instant case, pertains to the minimum standards of administrative procedure required before depriving a citizen of life, liberty, or property.  *See Mathews*, 424 U.S. at 334–35 (emphasizing that the following factors must be considered when assessing a procedural due process claim:  (1) the private interests affected; (2) the risk of erroneous deprivation of those interests; (3) the probable value of additional procedural safeguards; and (4) the government's interests); *cf. Johnson v. United States*, No. 13-7120, 2015 WL 2473450, at *4 (U.S. June 26, 2015) ("Our cases establish that the Government violates th[e] guarantee [of due process] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement."); *id.* at *5 (holding that imposing an increased sentence under the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B), violates the Constitution's guarantee of due process because "the indeterminacy of the wide-ranging inquiry required by the residual clause denies fair notice to defendants and invites arbitrary enforcement").

### b.  As Implicated in Sentence Administration Decisions

### i.  Supreme Court

Recognizing that the loss of physical freedom is one of the greatest trespasses on liberty, between 1972 and 1979, the Supreme Court decided three landmark cases that identified new "liberty" interests that expanded the scope of constitutional procedural due process claims available to prisoners.  *See Morrisey v. Brewer*, 408 U.S. 471 (1972); *Wolff v. McDonnell*, 418 U.S. 539 (1974); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979).

In *Morrisey*, the petitioners filed *habeas corpus* petitions, alleging that they had been denied procedural due process when their paroles were revoked by the Iowa Board of Parole without a hearing. *Morrisey*, 408 U.S. at 474. The Court held that parolees have a liberty interest in their continued release on parole, which states cannot revoke without procedural due process. A parole authority's final hearing on parole revocation is limited to a narrow inquiry, not to be equated to a criminal prosecution. It must be flexible enough to consider evidence, including letters, affidavits, and other material, which would be inadmissible in an adversarial criminal trial. *Id.* "The liberty of a parolee," it explained, "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.*; *see also Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (holding that there is no difference relevant to the guarantee of procedural due process between revocation of parole and revocation of probation where sentence has been imposed previously because "[p]robation revocation, like parole revocation, is not a state of a criminal prosecution, but does result in a loss of liberty").

In *Wolff*, the Court extended its decision in *Morrisey* to hold that procedural due process is violated when a prisoner's earned good time credits are revoked and the date of presumptive release delayed without a hearing. *Wolff*, 418 U.S. at 556–57. The Court wrote:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison . . . . But *the State having created the right to good time* and itself recognizing that its deprivation is a sanction authorized for major misconduct, *the prisoner's interest* has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to *entitle him to those minimum procedures appropriate under the circumstances* and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

. . . This analysis as to liberty parallels the accepted due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests. The requirement for some kind of a hearing applies to the taking of private property, the revocation of licenses, [and] the operation of state dispute-settlement mechanisms, when one person seeks to take property from another, or to government-created jobs held, absent "cause" for termination[.]

. . . For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty . . . . [But] [t]he deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance . . . .

*Id.* at 557–59 (emphasis added).

*Greenholtz*, decided five years after *Wolff*, held that the basic rules of due process were necessary when denying an inmate's request for release on parole when the relevant state parole statute created a liberty interest. *Greenholtz*, 442 U.S. at 15. The Court explained that this base requirement was less than that which was required under the revocation of parole, as discussed in *Morrissey*. *Id.* at 9–10. Where the parole board provided inmates with an opportunity to be heard, and informed them of the rationale for the denial, the Court held that due process, as required by the Constitution, had been satisfied. *Id.* at 15–16. "[P]arole release and parole revocation are quite different[,]" the Court explained, as "[t]here is a crucial distinction between being deprived of a liberty one has . . . and being denied a conditional liberty that one desires." *Id.* at 9.

By the end of the 1970s it was clear that presumptive release statutes create liberty interests for prisoners. Any sentence administration decision that did not form part of a criminal

prosecution, but resulted in the loss of liberty, required that procedural due process requirements be followed.

When *Morrisey*, *Wolff*, and *Greenholtz* were decided, their impact was limited because most states had indeterminate sentencing schemes that did not implicate the expectation of release at any particular time prior to the termination of their maximum sentence. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 487 (1995) (finding that no procedural due process protections exist because timing of prisoner's release was left entirely to the discretion of the State of Hawaii). Times changed that impact.

> [S]ince the 1970s, there has been a striking shift away from discretionary parole release systems with indeterminate sentences to mandatory release systems with determinate sentences. In a mandatory or presumptive release system, release on parole is required or presumed once the prisoner serves a minimum term, reduced by earned good time. Unlike earlier indeterminate sentencing systems that left the timing of release entirely to the discretion of the paroling authorities once the minimum term had been served, these newer statutes create an entitlement to release upon the expiration of the minimum term, unless the state makes particular findings. *A decision to deny or delay consideration for release under these determinate sentencing laws triggers due process requirements because it deprives the prisoner of a liberty interest.*

Nancy J. King & Suzanna Sherry, *Habeas Corpus and State Sentencing Reform: A Story of Unintended Consequences*, 58 Duke L. Rev. 1, 8–9 (2008) (emphasis added). By the 1990s, presumptive parole release schemes were starting to replace discretionary ones in a number of states. *See, e.g.*, Joan Petersilia, *When Prisoners Come Home: Parole and Prisoner Reentery*, 66–67 (2003) (noting that the states eliminating discretionary parole release in favor of mandatory release schemes in the 1990s were Arizona, Delaware, Kansas, Mississippi, North Carolina, Ohio, Virginia, and Wisconsin); Daniel S. Medwed, *The Innocent Prisoner's Dilemma:*

*Consequences of Failing to Admit Guilt at Parole Hearings*, 93 Iowa L. Rev. 491, 497–504

(2008) ("Between 1990 and 1999, the number of discretionary parole releases . . . declined

nearly twenty percent, while the number of mandatory parole releases almost doubled.").

The Supreme Court's 2010 decision in *Comstock* did not narrow the liberty interests of

prisoners subjected to imprisonment beyond their release date. *United States v. Comstock*, 560

U.S. 126 (2010). In *Comstock*, the Court held that "the civil commitment of a mentally ill,

sexually dangerous federal prisoner beyond the date [of his release]," pursuant to section 4248 of

title 18 of the United States Code, did not violate the Constitution's Necessary and Proper

Clause. *Id.* But, it did so with the understanding that it was *not* reaching or deciding "any claim

that the statute or its application denies equal protection of the laws, procedural or substantive

due process, or any other rights guaranteed by the Constitution." *Id.* at 149–50; *see also The*

*Supreme Court—Leading Cases, Necessary and Proper Clause*, 124 Harv. L. Rev. 279, 284–86

(2010) ("The majority's core holding—that the federal government's custodial power over

federal prisoners justifies section 4248—rests on uncertain ground. As the dissent noted, the

government is not the custodian of persons after their terms of imprisonment expire . . . . The

determination that a person's mental illness would make it difficult for him to refrain from

sexually violent conduct if released is tantamount to a determination that the person still needs

rehabilitation[.]").

### ii. Court of Appeals for the Second Circuit

In 1987, the Court of Appeals for the Second Circuit stated that a "parole grantee has a

protectable liberty interest that entitles him to due process in . . . parole rescission hearings."

*Green v. McCall*, 822 F.2d 284, 287 (2d Cir. 1987). In *Green*, federal prisoners whose early

release dates had been set, but who had not yet been released from prison, sought injunctive

relief prohibiting rescinding of parole grant of any member of plaintiff class during pendency of litigation without first being affording procedural safeguards. *Id.* at 285. The Court of Appeals affirmed the district court's grant of the injunctive relief sought. *Id.* Ruled was that the state's commission must, as a minimum, end the arbitrary rescission of a parolee's release date, and provide due process to parolees, including the right to be represented by counsel and call witnesses at a hearing. *Id.*

Six years later, the Court of Appeals for the Second Circuit held that an inmate "has a *liberty interest in being released from prison as soon as possible* . . . [and] *set free at the end of his term*." *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 653 (2d Cir. 1993) (emphasis added) (where state failed to provide final hearing or show impracticability of such, prison officials had no constitutional authority to hold inmate in prison for five extra days beyond maximum expiration date based upon alleged parole violation). "Due process," the Court of Appeals for the Second Circuit explained, "requires, as a general matter, an 'opportunity to be heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mathews*, 442 U.S. at 333). The parole board had violated the procedural due process rights of the defendant when it chose not "to hold the final revocation hearing before the original maximum expiration date, or demonstrate that it would have been impracticable to do so." *Id.* at 654; *see also Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

"Only the judgment of a court, as expressed through the sentence imposed by a judge, has the power to constrain a person's liberty." *Earley v. Murray*, 451 F.3d 71, 75 (2d Cir. 2006) (citing *Hill v. United States ex rel. Wampler*, 298 U.S. 460, 464 (1936)). "Any alteration to that

sentence, unless made by a judge in a subsequent proceeding, is of no effect." *Earley*, 451 F.3d at 75. "The Supreme Court [] recognizes that procedural requirements in sentencing demand that a sentence must be imposed by a judge, on the record, in court." *Id.* at 76 n.1. In *Earley*, the judgment levied on the petitioner at sentencing provided for "six years of [imprisonment] and no more." *Id.* at 75. Petitioner was, however, subjected to additional custody subsequent to his release from prison in the form of "post-release supervision, admitting of the possibility of revocation and additional jailtime." *Id.* The added terms of petitioner's custody were ruled invalid because "administrative authorities have no . . . power to alter a sentence" as "[t]he imposition of a sentence is a judicial act; only a judge can do it." *Id.*

### iii. District Courts in the Second Circuit

District courts in this circuit have recognized that a prisoner's liberty interest is implicated in a presumptive release date. *See, e.g.*, *Dickinson v. LeClaire*, No. 9:11-CV-0880, 2012 WL 6965111, at *4 (N.D.N.Y. Dec. 17, 2012) ("Inmates have a liberty interest in being released upon the expiration of their *maximum* term of imprisonment[,]" and all "liberty interests [are] protected by due process . . ." (citation and internal quotation marks omitted)), *report and recommendation adopted*, 2013 WL 372478 (N.D.N.Y. Jan. 30, 2013); *Sudler v. Goord*, No. 08-CV-11389, 2011 WL 691239, at *5 (S.D.N.Y. Feb. 23, 2011) ("An individual's liberty interest in freedom from physical detention is a fundamental constitutional right." (internal citation and quotation marks omitted)); *Ford v. Conway*, No. 03-CV-0927, 2009 WL 1924748, at *6 (W.D.N.Y. July 1, 2009) ("There is no dispute, a prisoner has a liberty interest in being released upon the expiration of his maximum term of imprisonment." (citation omitted)).

A due process analysis has been applied to claims alleging violation of a "liberty interest" resulting from prolonged incarceration. *See, e.g.*, *Brunson v. Duffy*, 14 F. Supp. 3d 287, 292

(S.D.N.Y. 2014) ("To allege a claim generally under the Fourteenth Amendment [], a plaintiff must allege that he was denied an opportunity to be heard at a meaningful time and in a meaningful manner with respect to his prolonged-incarceration claim." (citation and internal quotation marks omitted)); *Parker v. New York State Div. of Parole*, No. 04-CV-3901, 2012 WL 1059367, at *5 (S.D.N.Y. Mar. 28, 2012) ("The Second Circuit has held that a parolee has a constitutional due process claim when he is detained beyond his maximum detention date without a final revocation hearing." (citing *Calhoun*, 999 F.2d at 653)); *Sudler v. City of New York*, No. 08-CV-11389, 2010 WL 68095, at *10 (S.D.N.Y. Jan. 8, 2010) (denying dismissal of due process claim where respondent violated petitioner's liberty interests by having him serve his sentences consecutively despite a court order for concurrent running), *report and recommendation adopted,* 2010 WL 726964 (S.D.N.Y. Feb. 19, 2010).

### iv.  28 U.S.C. § 2241

Where prisoners allege a violation of due process with respect to the administration of their sentences, relief is sought under section 2241 of title 28 ("section 2241") of the United States Code.  *See, e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973) (where petitioner challenged the deprivation of his good time credits and sought injunctive relief to restore credits, which would have resulted in immediate release from confinement, court held that the exclusive remedy was *habeas corpus*); *Cook v. New York State Div. of Parole*, 321 F.3d 274, 278 (2d Cir. 2003) ("Because a federal prisoner cannot challenge the execution of his or her sentence by a motion under section 2255, he or she must resort to a section 2241 petition to do so."); *Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997) ("A petitioner seeking to challenge the legality of the imposition of a sentence by a court may therefore make a claim pursuant to Section 2255. . . .  A challenge to the execution of a sentence, however, is properly filed pursuant

to Section 2241." (citations omitted)); *Pimentel v. Gonzales,* 367 F. Supp. 2d 365, 369–71

(E.D.N.Y. 2005) (same); *Franceski v. Bureau of Prisons*, No. 04-CV-8667, 2005 WL 821703, at

*2 (S.D.N.Y. Apr. 8, 2005) ("Section 2241 of title 28 has long been recognized as the basis for

challenging the execution of the sentence of a person in federal custody." (citation omitted)).

### 3. *Ex Post Facto* Clause

#### a. Generally

The United States Constitution forbids the federal government from enacting any "ex

post facto law." U.S. Const. art. I, § 9, cl. 3. The "touchstone" of the inquiry into whether the *ex*

*post facto* clause has been violated is "whether a given change in law presents a sufficient risk of

increasing the measure of punishment attached to the covered crimes." *Peugh v. United States*,

133 S. Ct. 2072, 2082 (2013). In *Miller*, the Supreme Court held that two elements must be

present before a violation of the *ex post facto* clause occurs: "*first*, the law must be retrospective,

that is, it must apply to events occurring before its enactment; and *second*, it must disadvantage

the offender affected by it." *Miller v. Florida*, 482 U.S. 423, 430 (1987) (emphasis added)

(citations and internal quotation marks omitted), *abrogated in part on other grounds by Peugh*,

133 S. Ct. 2072. The inquiry into whether a change in law creates a disadvantage is "a matter of

degree" that cannot be narrowed to a "single formula." *Peugh*, 133 S. Ct. at 2082.

> Although the Latin phrase *ex post facto* literally encompasses any
> law passed after the fact, it has long been recognized by [the
> Supreme] Court that the constitutional prohibition on *ex post facto*
> laws applies only to penal statutes which disadvantage the offender
> affected by them. As early opinions [of the Supreme] Court
> explained, *ex post facto* law was a term of art with an established
> meaning at the time of the framing of the Constitution.

*Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (citation and internal quotation marks omitted).

"The *ex post facto* prohibition forbids the Congress and the States to enact any law which

imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (citation and internal quotation marks omitted) (framing the inquiry as "[w]hether a retrospective state criminal statute ameliorates or worsens conditions imposed by its predecessor").

In 1798, the Supreme Court delineated four categories of laws that violate the *ex post facto* clause. *Calder v. Bull*, 3 U.S. 386, 390 (1798). *First*, "[e]very law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Id. Second*, "[e]very law that aggravates a crime, or makes it greater than it was, when committed." *Id. Third*, "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id. Fourth*, "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Id.*

### b. As Implicated in Sentence Administration Decisions

The Supreme Court has "not attempted to precisely delimit the scope of this Latin phrase, but [has] instead given it substance by an accretion of case law." *Peugh*, 133 S. Ct. at 2072 (citations and internal quotation marks omitted) (holding *ex post facto* clause violated when sentencing defendant under current guidelines provided higher sentencing range than guidelines in effect at time offense committed). The clause has been used to invalidate laws that either eliminated or limited a potential for freedom that had previously been available to prisoners or alleged criminals. *See, e.g.*, *Lynce v. Mathis*, 519 U.S. 433, 446–47 (1997) (finding an *ex post facto* violation where statute at issue eliminated early-release credits for prison inmates); *Miller*, 482 U.S at 424–27 (finding *ex post facto* violation where increase in guidelines range applicable

to offender created a "significant risk" that he would receive a higher sentence); *Weaver*, 450 U.S. at 36 (finding *ex post facto* violation where the statute limited availability of good-conduct credits for inmates); *Lindsey v. Washington*, 301 U.S. 397, 398–402 (1937) (finding *ex post facto* violation where statute replaced a discretionary "0 to 15 years" term of imprisonment with a mandatory fifteen-year term).

The Court of Appeals for the Second Circuit has characterized the Supreme Court's decision in *Lynce* as showing that "the *ex post facto* doctrine condemns legislative acts that offend our fundamental sense that the government should not make more harsh the law governing the treatment of convicted criminals after their criminal acts are in the past." *Sash*, 429 F.3d at 66. In *Lynce*, the Florida legislature authorized the award of early-release credits to prison inmates when the population of the state prison system exceeded predetermined levels. *Lynce*, 519 U.S. at 435. Ten years later, after the credits had been awarded, the legislature passed a statute cancelling the credits for certain classes of offenders. *Id.* at 437–39. As a result, some former prisoners were ordered back into state custody although their underlying conduct had not changed. *Id.* at 447. The Court held that these legislative actions were subject to the restraints of the *ex post facto* clause, whether or not the overcrowding credits pertained in any way to the original sentence. *Id.* at 445.

The Supreme Court has "firmly establish[ed] that changes in law need not bind a sentencing authority in order to violate the *Ex Post Facto* Clause." *Peugh*, 133 S. Ct. at 2086. Advisory and binding rules issued by the Sentencing Commission are not insulated from *ex post facto* clause challenges. *Id.* at 2085 ("While the Government argues that the Sentencing Commission is insulated from legislative inference, . . . our precedents make clear that the coverage of the *Ex Post Facto* Clause is not limited to legislative acts."). The clause covers

actions beyond those that are purely legislative and includes regulatory acts, such as the promulgation of amendments to the guidelines and policy statements by the Commission. *See Garner v. Jones*, 529 U.S. 244, 256–57 (2000) (recognizing that change in a parole board's rules could, given an adequate showing, run afoul of the *ex post facto* clause). *But see California Dep't of Corr. v. Morales*, 514 U.S. 499, 508–09 (1995) (noting that mere speculation or conjecture that a change in law will retrospectively increase the punishment for a crime will not suffice to establishing a violation of the *ex post facto* clause).

The *ex post facto* clause is violated when sentencing a defendant under current guidelines provides a higher sentencing range than the guidelines in effect at the time of the offense. *Peugh*, 133 S. Ct. at 2088. In *Peugh*, defendant was convicted of bank fraud for conduct that occurred in 1999 and 2000. *Id.* at 2078. At his sentencing hearing in 2009, the district court used the current guidelines in effect, yielding a guidelines imprisonment range of seventy to eighty-seven months. *Id.* Defendant argued that the proper guidelines range was between thirty and thirty-seven months, the range in effect at the time his offenses were committed. *Id.* The court disagreed, sentencing him to seventy months. *Id.* at 2079.

The Court of Appeals for the Seventh Circuit affirmed. *Id.* The Supreme Court reversed and remanded, noting that this case fell within *Calder*'s third category of *ex post facto* violations. *Id.* at 2088. Its reasoning was that "altering the substantive formula used to calculate the applicable sentencing range" had created "a significant risk of a higher sentence," impermissibly enhancing the measure of punishment inflicted on defendant. *Id.* (citation and internal quotation marks omitted); *see also Morales*, 514 U.S. at 505 ("The *Ex Post Facto* Clause forbids the [government] to enhance the measure of punishment by altering the substantive formula used to calculate the applicable sentencing range.").

*Peugh* resolved the circuit split that had existed regarding whether amendments to the guidelines that enhance the severity of sentences violate the *ex post facto* clause when applied retroactively. *See, e.g.*, *United States v. Turner*, 548 F.3d 1094, 1096–97 (D.C. Cir. 2008) (identifying circuit split and discussing cases). "To prevail on this type of *ex post facto* claim, [a] defendant must show that the law he challenges operates retroactively (that it applies to conduct completed before its enactment) and that it raise the penalty from whatever the law provided when he acted." *Johnson v. United States*, 529 U.S. 694, 699 (2000).

The Court of Appeals for the Second Circuit has defined the doctrine as concerned "with the inherent injustice associated with retroactivity itself." *Sash*, 439 F.3d at 64. It "applies to any penal enactment that retrospectively disadvantages a criminal offender, *whether or not it increases a criminal sentence*, and applies to regulations governing the conditions of imprisonment as well as to the length of sentences." *Id.* at 65 (emphasis added).

A somewhat analogous claim to the one now before this court was brought in the Northern District of Illinois in 2013. *See United States v. King*, No. 99-CR-952-1, 2013 WL 4008629 (N.D. Ill. Aug. 5, 2013). It was decided two months after *Peugh*. *Id.* In *King*, the defendant sought to reduce his sentence pursuant to section 3582(c)(2) and amendment 750 to the guidelines, which made permanent adjustments to the offense levels in the guidelines applicable to various quantities of crack cocaine. *Id.* at *1. The government failed to appear, presenting no opposition to the motion for a reduced sentence. *Id.* at *3. The motion was granted and defendant's sentence was reduced from 235 months to 170 months. *Id.* at *4. Immediately after the order was issued, the government filed an "emergency" motion to stay. *Id.* It was converted into a motion to reconsider the reduction. *Id.*

Urged by the government was that the 170-month term was below the low-end of the amended guidelines range and therefore impermissible under section 1B1.10(b)(2)(A) of the guidelines. *Id.* at *13. Section 1B1.10(b)(2)(A), at the time, read in relevant part: "[T]he court shall not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guidelines range . . . ." U.S.S.G. § 1B1.10(b)(2)(A) (2012 ed.). Defendant responded that application of section 1B1.10(b)(2)(A) to his section 3582(c)(2) motion violated the *ex post facto* clause. *King*, 2013 WL 4008629, at *19. He maintained:

> [T]he *Ex Post Facto Clause* was violated here because Section 1B1.10(b)(2)(A) of the 2012 Guidelines, which governs his sentence reduction pursuant to Application Note 6 of the commentary to that Section, increases the applicable amended Guidelines sentencing range that he may be entitled to when compared with the Guidelines in effect in 2008, when he was resentenced, and those in effect prior to 2000, when he committed his crimes.

*Id*.

The court agreed:

> When [defendant] was resentenced in 2008, the Guidelines would have allowed him to receive a reduced sentence of 170 months incarceration had Amendment 750 been in effect at that time. However, with the initial and subsequent enactments of Section 1B1.10(b)(2)(A), the extent to which [defendant's] sentence could be reduced was limited; Section 1B1.10(b)(2)(A) effectively increased [defendant's] reduced sentence to no less than 235 months incarceration.
> . . .
> . . . [T]he Court finds that Subsection (b)(2)(A) of Section 1B1.10 violates the *Ex Post Facto Clause* because it alters the formula used to arrive at the applicable reduced Guidelines sentencing range pursuant to a Section 3582(c)(2) motion, and in application has the effect of eliminating the discretion possessed by sentencing courts to reduce a defendant's term of imprisonment below the advisory Guidelines range and thus effectively increases the

Guidelines range to which a defendant's reduced sentence is subject. For these reasons, the Court holds that Section 1B1.10(b)(2)(A) of the Guidelines is unconstitutional.

. . .

In light of this conclusion, the Court denies the Government's motion for reconsideration. The only argument advanced by the Government as to why the Court must reconsider its prior Order in this case is that the Court was precluded from taking the action it did in light of Section 1B1.10(b)(2)(A). With the excision of Subsection (b)(2)(A) [from section 1B1.10], however, the Court maintained the discretion to reduce [defendant's] sentence to a term of imprisonment below the minimum of the amended advisory range.

*Id.* at *20–21 (citations omitted). *But see United States v. Montanez*, 717 F.3d 287, 294 (2d Cir. 2013) (without considering whether section 1B1.10(b)(2)(A) runs afoul of the *ex post facto* clause, affirming decision of district court that it was not permitted to depart from guidelines range arrived at after retroactive guidelines amendment as instructed by section 1B1.10(b)(2)(A)); *Savoy*, 567 F.3d 71, 73–74 (2d Cir. 2009) (same); *Montanez*, 717 F.3d at 294 ("We confess that, as a matter of policy, we question why a court should not have the discretion to give defendants the benefit of § 4A1.3 departures during sentencing reduction proceedings. A criminal history category that exaggerates a defendant's past crimes during an initial sentencing will continue to do so at a reduction proceeding. While the Commission apparently worried that retroactively amending the crack-cocaine guidelines could result in a windfall for defendants whose sentences already accounted for the disparity . . . , the policy adopted in [section] 1B1.10(b)(2)(A) sweeps much more broadly, affecting even defendants . . . who benefitted from departures that were unrelated to prior versions of the crack-cocaine guidelines. In any event, we recognize that *Congress has given the Commission the authority to resolve these policy questions. See Dillon* [560 U.S. at 817]. Because the Commission has clearly stated that a defendant's 'amended guideline range' does not incorporate any previously granted departure

under § 4A1.3, we affirm the district court's decision." (emphasis added)), *cert. denied sub nom. Brantley v. United States*, 134 S. Ct. 447 (2013), and *cert. denied sub nom. Stith v. United States*, 134 S. Ct. 447 (2013).

### 4. Eighth Amendment

Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by our Constitution. When labeling punishment as cruel and unusual, "the Supreme Court has not limited itself to 'historical conceptions' of impermissible sanctions[.]" *United States v. Reingold*, 731 F.3d 204, 210 (2d Cir. 2013) (quoting *Graham v. Florida,* 560 U.S. 48, 58 (2010)). Rather, it "has looked to 'the evolving standards of decency' that mark the progress of a maturing society[.]" *Reingold*, 731 F.3d at 210 (quoting *Kennedy v. Louisiana,* 554 U.S. 407, 419 (2008)).

The Court has recognized that imprisonment is a punishment subject to scrutiny under Eighth Amendment jurisprudence. *See Hutto v. Finney*, 437 U.S. 678, 685 (1978) (holding that district court had authority to place maximum limit of thirty days on confinement in isolation cells). Punishment "totally without penological justification" violates the Eighth Amendment. *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citation and internal quotation marks omitted) (finding inmate subjected to cruel and unusual punishment in violation of the Eighth Amendment when prison guards handcuffed him to hitching post for disruptive behavior, despite his having already been subdued). "We think there can be no doubt that imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment." *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1993) ("Indeed, confinement in a prison pursuant to a conviction but beyond the term of a sentence seems to us quintessentially punitive . . . . Although a mistaken basis for detention may have some bearing on whether the detention was cruel and unusual, a

mistaken basis for imprisonment does not alter the *punitive* nature of [defendant's] prolonged imprisonment." (emphasis in original) (citations and internal quotation marks omitted)); *cf. Davis v. Ayala*, No. 13-1428, 2015 WL 2473373, at *21 (U.S. June 18, 2015) ("Prisoners are shut away—out of sight, out of mind. It seems fair to suggest that, in decades past, the public may have assumed lawyers and judges were engaged in a careful assessment of correctional policies, while most lawyers and judges assumed these matters were for the policymakers and correctional experts." (Kennedy J., concurring)).

### C. Application of Law to Facts

Movant is eligible for a reduction in sentence. *See supra* Part III.A.3.c (detailing 2014 "drugs minus two" amendments). His new offense level is thirty-seven, criminal history category I, with a guidelines range of 210–262 months. *See supra* Part II.C (identifying his resentencing offense level in 2002 as "thirty-nine" and an imprisonment guidelines range of "262-327 months"); *see also* Hr'g Tr., July 15, 2015.

In light of the section 3553(a) factors enumerated in title 18 of the United States Code, based on a consideration of movant's submission, as well as prior submissions made in connection with his sentencing, it is determined that the reduction in sentence should be granted. *See* 18 U.S.C. § 3553(a). Alli-Balogun has already served more than 262 months. *See supra* Parts II & III.A.4.a (laying out "two-step inquiry" establishing by Supreme Court regarding section 3582(c)(2) resentencing). He has been a model prisoner. *See supra* Part II.D.1. His present release date is July 5, 2016. *Id.* His family support and personal characteristics demonstrate that recidivism is unlikely. *Id.* General and specific deterrence has been served. As a citizen of Nigeria, he will probably be deported. *See, e.g.*, *Chin Chong*, 2014 WL 4773978, at *13.

Alli-Balogun is being sentenced to time-served and a supervised release term of three years. *See* Hr'g Tr., July 15, 2015. His release is ordered forthwith but, taking into consideration that a detainer has already been lodged by immigration authorities, the decision is stayed for ten days. *Id.*

The date of release ordered by the court is not in accordance with the November 1, 2015 release date that appears in the "special instruction" issued by the Sentencing Commission in section 1B1.10(e) of the guidelines. The court finds that it is not bound by the instruction. It also finds that this court's ruling can easily be carried out without burdening the courts, prisons or other authorities, and would not endanger the public.

### 1. Rule of Lenity

While the term "special instruction" appears to fall under the larger ambit of section 1B1.10, a "policy statement," the meaning of the term and its mandatory application to an individual's case is, on its face, ambiguous. *See* U.S.S.G. § 1B1.10(e). *Compare Black's Law Dictionary* (10th ed. 2014) (the term "policy" is a "standard course of action that has been officially established by an organization . . . .") *with id.* (the term "special instruction" is defined as "See Jury Instruction," which leads to the following definition: "[a]n instruction on some particular point or question involved in the case, usu. in response to counsel's request for such an instruction.").

The reason for the "special instruction" is explained in the supplement to the guidelines. But at no point does the supplement explain the relationship between the instruction, promulgated after the Supreme Court's ruling in *Dillon*, and the section 3553(a) factors that must be assessed when a district court determines that an individual defendant is entitled to a sentencing reduction under section 3582(c)(2). *See supra* Part III.A.3.c.i (discussing reason for

amendment to the guidelines); Part III.A.4.a. (explaining that the second part of a section 3582(c)(2) inquiry pursuant to the Supreme Court's ruling in *Dillon* is to assess the particular characteristics of the defendant under section 3553(a)).

The meaning of the term "special instruction" is unclear. It is in apparent conflict with the district court's power under section 3582(c)(2) that, pursuant to *Dillon*, mandates a section 3553(a) analysis. *See supra* Part III.A.4.a. Because section 3553(a) directs a district court to impose a sentence that is "*sufficient but not greater than necessary*," application of the rule of lenity is warranted when assessing section 1B1.10(e) of the guidelines. *See supra* Part III.B.1. Reading the "special instruction" in the manner most favorable to a defendant leads to the conclusion that it is only to be referred to in cases where it would not result in sentencing a defendant to a term in excess of the maximum guidelines range applicable pursuant to a retroactive application of amendment 782.

Because defendant has served 273 months in prison, eleven months more than the maximum guidelines term applicable pursuant to a retroactive application of amendment 782, lenity prevails and dictates that he be released as soon as feasible.

### 2. Due Process

Alternatively, the "special instruction" violates procedural due process. *See supra* Part III.B.2. The Court of Appeals for the Second Circuit has held that liberty interests are implicated when an inmate is not set free at the end of her incarceral term in the absence of a facially valid court order or warrant. *See supra* Part III.B.2.b.ii. Section 1B1.10(e) of the guidelines, as drafted, places the "liberty interest" of those eligible to receive a "time-served" sentence, pursuant to section 3582(c)(2) and a retroactive application of amendment 782, in jeopardy. It is unconstitutional where it has the effect of forcing inmates to remain incarcerated beyond the

presumptive release date associated with the terms of a reduced sentence. *See supra* Part III.B.2.a. The court, in the exercise of its *Booker* discretion, set a date for release before that in section 1B1.10(e). Having heard argument on the date of release, one, but only one, of the factors considered at this hearing was the concern of the Commission about burdens on the system of possibly massive early release. *See* Hr'g Tr., May 14, 2015. Interfering with a presumptive release date from prison, as the Sentencing Commission has done with the promulgation of section 1B1.10(e), entitles affected prisoners to an opportunity to be heard at a meaningful time and in a meaningful manner. *See supra* Part III.B.2.b.iii. The Commission has provided for no such opportunity.

Since section 3582(c)(2) provides a prisoner eligible for a sentencing reduction the opportunity to be heard, it is at this hearing that a district judge should assess whether a recommended release date that extends beyond a prisoner's presumptive release date, when balanced with the government's interests, should be followed. *See supra* Part III.A.4 (discussing two-part inquiry district courts follow in determining eligibility for sentencing reduction under section 3582(c)(2)); *cf. supra* Part III.B.2 (discussing development of procedural due process law with respect to the liberty interests of prisoners, probationers, and parolees).

Denying a prisoner the right to be heard regarding a desired conditional liberty interest violates due process. *See supra* Part III.B.2.b.i. A defendant eligible for a time-served sentence pursuant to a retroactive application of amendment 782, but explicitly denied this right solely pursuant to section 1B1.10(e), might well have a right to bring a *habeas* petition under section 2241 of title 28 seeking relief pursuant to the due process clause of the United States Constitution. *See supra* Part III.B.2.b.iv.

Petitioner's request for immediate release from the custody of the Bureau of Prisons pursuant to a motion for a reduction in sentence under section 3582(c)(2) is being construed as a 2241 petition. Section 2241 of title 28 of the United States Code recognizes the power of federal judges to grant writs of *habeas corpus*. In relevant part, section 2241 reads: "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). Writs of *habeas corpus* are usually issued after trial in a federal court when it is claimed, *inter alia*, that the trial or sentence involved errors in violation of constitutional rights of the petitioner. *See* 28 U.S.C. § 2241(c)(3) ("in custody in violation of the Constitution"); 28 U.S.C. § 2255 (federal custody; remedies on motion attacking sentence).

The Court of Appeals for the Second Circuit has held that "it is the substance of the petition, rather than its form that governs" the treatment of section 2241 and other *habeas* petitions in district courts. *Cook v. New York State Div. of Parole*, 321 F.3d 274, 278 (2d Cir. 2003) (internal quotation marks and citation omitted). Based on the nature of the claims and relief sought by a petitioner, it is within the discretion of district court judges to assess a mislabeled petition and proceed with analysis under appropriate statutory sections. *See Jackson v. Capra*, 14-CV-202, 2015 WL 367085, at *4 (S.D.N.Y. Jan. 28, 2015) (treating petition labeled a section 2241 petition as section 2254 petition based on the nature of petitioner's claim), *report and recommendation adopted by* 2015 WL 1064900 (S.D.N.Y. Mar. 2, 2015); *Lester v. Shult*, 09-CV-421, 2009 WL 1140485, at *4 (N.D.N.Y. Apr. 27, 2009) (treating 2241 petition as a 2255 petition where petitioner challenged the validity of his underlying conviction rather than the execution of sentence).

Because section 1B1.10(e) of the guidelines denies inmates the right to procedural due process regardless of whether they have exceeded the terms of their sentence pursuant to a retroactive application of amendment 782, the court is not bound by the instruction.

Petitioner's request for release pursuant to section 2241 is granted.

### 3. *Ex Post Facto* Clause

At issue in this case is the third category of *ex post* facto laws enumerated in *Calder*—those that inflict a greater punishment on the defendant than the law annexed to the crime when it was committed. *See supra* Part III.B.3.a. Had amendment 782 been in effect in 1992 when the crime at issue was committed, and had defendant received the highest end of the then-mandatory guidelines range, he would have been sentenced to 262 months. *See supra* Part II.C (identifying defendant's resentencing offense level as "thirty-nine," criminal history category I); Part III.A.3.c (discussing amendment 782).

Ordering a "time-served" sentence is not available to a district court judge prior to November 1, 2015 under section 1B1.10(e) of the guidelines. *See* U.S.S.G. § 1B1.10(e). This alters the formula used to arrive at the applicable reduced guidelines sentencing range pursuant to a section 3582(c)(2) "drugs minus two" motion. The "special instruction" effectively increases defendant's sentence beyond even the dictates of section 1B1.10(b)(2)(C) of the guidelines, which prohibits a district court from reducing the term of an inmate's imprisonment to less than the term imprisonment that the defendant has already served. *See* U.S.S.G. § 1B1.10(b)(2)(C); *see also supra* Part III.B.3.b. Eliminated is the discretion possessed by the district court to sentence a defendant to "time-served" based on section 3553(a) factors. *See supra* Part III.B.3.b.

Unilaterally increasing the maximum term of the applicable guidelines range, to which a defendant's reduced sentence is subject, violates the *ex post facto* clause of the United States Constitution, rendering section 1B1.10(e) of the guidelines advisory, not mandatory.

### 4. Eighth Amendment

Forcing inmates to stay in prison beyond the release date ordered by the district court violates a prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution. *See supra* Part III.B.4. Prolonged imprisonment beyond one's maximum applicable term of imprisonment lacks penological justification. *Id.* Arguments about convenience and bureaucratic morass made by government officials cannot be used to obfuscate the basic tenets upon which this country was founded. *See supra* Part III.A.3.c.

Section 1B1.10(e), as applied to Alli-Balogun, violates the United States Constitution. The November 1, 2015 release date cannot be foisted upon him.

## IV. Motion to Vacate Conviction, 28 U.S.C. § 2255

### A. Law

Petitioner's simultaneous independent motion to vacate, set aside, or correct his sentence is governed by section 2255 of title 28 of the United States Code. *See* 28 U.S.C. § 2255. Petitioner bears the burden of proof by a preponderance of the evidence. *See Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000). The statute provides that a court shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b).

A 2255 petition is a modern descendant of the common law petition for a writ of *habeas corpus*. It may not be used as a substitute for a direct appeal; it is a collateral attack on a final

judgment.  *See, e.g.*, *Yick Man Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010) ("claims that could have been brought on direct appeal [cannot] be [] raised on collateral review absent cause and prejudice"); *United States v. Frady,* 456 U.S. 152, 165 (1982) (same).  Where a petitioner fails to bring a claim on direct appeal, he is precluded from raising that claim in a later section 2255 proceeding unless he can establish both cause for the procedural default and resulting actual prejudice.  *See Amiel v. United States*, 209 F.3d 195, 198 (2d Cir. 2000).

Relief is available only in limited circumstances to prisoners in federal custody.  A properly filed 2255 petition must allege one of the following four grounds for relief:  (1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the sentencing court was without jurisdiction to impose the sentence; (3) that the sentence was in excess of the maximum authorized by law; or (4) that the sentence is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.").

The Court of Appeals for the Second Circuit has held that relief pursuant to section 2255 is available only "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice."  *Graziano v. United States,* 83 F.3d 587, 590 (2d Cir. 1996) (citation and internal quotation marks omitted); *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (same).  "The reasons for narrowly limiting the relief permitted under [section] 2255—a respect

74

for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place—are 'well known and basic to our adversary system of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *United States v. Addonizio*, 442 U.S. 178, 184 & n.11 (1979)).

"Section 2255 is not a vehicle for re-litigating claims that have been raised and resolved on direct appeal." *Yick Man Mui*, 614 F.3d at 53 (citation and internal quotation marks omitted); *Barton v. United States*, 791 F.2d 265, 267 (2d Cir. 1986) (per curiam) (same). "Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal." *Chin v. United States*, 622 F.2d 1090, 1092 (2d Cir. 1980).

A district court may rely on its own familiarity with the case and deny the 2255 motion where the motion lacks "meritorious allegations that can be established by competent evidence." *United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990); *Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1997) (same).

Challenging a judgment entered on resentencing is considered a "first" collateral attack on that new judgment and is not a "second" or "successive" petition. *Magwood v. Patterson*, 561 U.S. 320, 331 (2010). In *Magwood*, petitioner challenged his sentence filed after an amendment judgment was entered by the court. *Id.* at 323. The Court of Appeals for the Second Circuit summarized *Magwood*'s conclusion that a resentence is a first sentence for section 2255 purposes as follows:

> After a state prisoner had filed a [*habeas*] petition challenging his Alabama murder conviction and death sentence, the district court conditionally granted his petition and vacated his death sentence. The trial court subsequently held new sentencing proceedings, and it again sentenced the state prisoner to death. He then filed a

[*habeas*] petition challenging his new sentence on the ground that, *inter alia*, he did not have fair warning that his conduct would be sufficient to warrant a death sentence under Alabama law. The district court granted the petition, concluding that it was not successive . . . and that the state prisoner's fair warning claim was meritorious. The Eleventh Circuit reversed[,] . . . conclude[ing] that the state prisoner's fair warning claim was successive because it could have been raised in his prior [*habeas*] petition . . . . [The Supreme Court affirmed the ruling of the district court.]

*Johnson v. United States*, 623 F.3d 41, 44 (2d Cir. 2010) (internal citations omitted) (holding that the Supreme Court's decision in *Magwood* applied to section 2255 petitions).

*Johnson* addressed the issue left open in *Magwood* as to whether a petitioner who obtains a conditional writ as to his sentence "may" file a subsequent application challenging not only his resulting new sentence, but also his original undisturbed conviction. *Id.* at 45. Responding in the affirmative, the Court of Appeals for the Second Circuit ruled that a judgment of conviction includes both the adjudication of guilt and the sentence:

[W]here a first habeas petition results in an amended judgment, a subsequent petition is not successive regardless of whether it challenges the conviction, the sentence, or both . . . A different result is not warranted by the fact that [petitioner's] claims could have been raised in his prior [*habeas*] motion or the fact that he effectively challenges an unamended component of the judgment. In light of *Magwood*, we must interpret successive applications with respect to the judgment challenged and not with respect to particular components of that judgment.

*Id.* at 46.

## B. Application of Law to Facts

Alli-Balogun's instant 2255 petition is not considered "successive." *See supra* Part IV.A. It is denied as a first petitioner on the merits.

Petitioner's claims in the instant motion are based upon claims already disposed of on the merits. *See generally supra* Part II. There is no need to reanalyze issues that have already been

fully addressed by this court and the Court of Appeals. *See supra* Part IV.A; Hr'g Tr., May 14, 2015. The petitioner had a fair trial. His lack of any valid constitutional claim respecting his trial or resentence of March 11, 2002, is fully established. *See generally supra* Part II.

Petitioner's motion to vacate, set aside, or correct his sentence is denied.

## V.    Conclusion

Movant's term of incarceration is reduced to "time-served." All other conditions of his prior sentence remain in effect. He shall be released forthwith. This order is stayed for ten days to permit Immigration and Customs Enforcement time to take custody of him pursuant to an existing detainer.

The motion for relief under section 2255 of title 28 of the United States Code is denied. A certificate of appealability is denied.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   July 15, 2015
        Brooklyn, New York